STATE OF CONNECTICUT *v.* JONATHAN HENRY
(13668)

Dupont, C. J., and Foti and Landau, Js.

Argued February 23—decision released April 23, 1996

*Howard A. Ehring*, assistant public defender, for the appellant (defendant).

*Lisa Herskowitz*, deputy assistant state's attorney, with whom, on the brief, were *Eugene Callahan*, state's attorney, and *Bruce Hudock*, senior assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of burglary in the second degree in violation of General Statutes § 53a-102. The defendant claims that the trial court improperly admitted evidence of his prior acts of misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Cindy Askew, a nineteen year old female, lived in a two-story row house located in the Southfield Village housing project in Stamford, along with her mother, grandmother and two younger brothers. The area is highly populated. The victim's house is an end unit and the victim had her own bedroom on the second floor. The room had one window, which had a broken lock. The window was recessed in the wall, forming a sill. The victim's bed was located against the wall with the foot of the bed in front of the window. Below and to the left of the window on the outside was a small awning that covered the front entrance of the house. A forty-three inch high fence extended out from the house next to the front door. At night, the area is brightly lit. A high intensity sodium light is affixed to the outside of the victim's house four feet from her bedroom window. Two additional high intensity lights are located about forty-seven feet from the bedroom window on a lamp post.

At approximately 2:30 a.m. on January 12, 1992, the victim prepared for bed by turning off her bedroom light, locking her door and pulling the window shade. Sometime prior to 4:50 a.m., the sound of the window shade scraping against the wall awoke the victim. She rolled onto her back, opened her eyes and observed a man in her window, kneeling, with one leg on the window sill and the other near the victim's bed. The window shade was on top of his head.

The victim screamed, got out of bed, unlocked the bedroom door and ran to her mother's bedroom. She called the police from her mother's room. The police arrived at 4:50 a.m. The intruder was described as a black male with dark skin and short hair on his head and face. He appeared to be between twenty-five and thirty-five years of age, and was wearing a dark jacket with a light-colored collar, a white scarf and tan pants. The police were unable to locate anyone fitting that description in the immediate area. The intruder gained entrance to the victim's bedroom by climbing onto the fence and then onto the awning.

Approximately two or three weeks after the incident, the victim saw the intruder standing near a playground in Southfield Village. A few weeks later, she saw him at a bus stop in Southfield Village. The police were unable to locate the intruder on either occasion. On May 5, 1992, the victim selected the defendant's picture from a photographic array and identified him as the man who had climbed in her window on January 12, 1992. The victim did not know the defendant but she did know his sisters and mother. The victim also made a positive in-court identification.

The defendant claims that the trial court improperly admitted evidence of his prior misconduct. During the state's case-in-chief, the prosecuting attorney sought to introduce evidence of the factual basis that led to the

defendant's conviction on a charge of sexual assault in 1982, arguing that the evidence was admissible to show identity, intent and method of operation. On March 9, 1993, the trial court conducted a hearing outside the presence of the jury.

In an offer of proof, the state presented the testimony of B,[1] the victim of the prior sexual assault, who testified that on March 6, 1982, she was nineteen years old and lived in Southfield Village. B's house was a two-story end unit, and B's bedroom was on the second floor. She lived in the house with her mother, father and three sisters.

On the night of March 5, 1982, B went to bed between 11:30 p.m. and midnight. She was alone in her bedroom, and her mother and younger sister were also in the house. B had two windows in her bedroom and left one open one inch. This window had a roof beneath it, and below that roof was an awning that covered an entrance to the residence. She also left the window shade up so that air could get into her room. Light came into the room from a light post outside the window. Numerous other lights illuminated the area around her house.

Sometime prior to 2:20 a.m. on March 6, B woke up and felt someone on top of her. She had been sleeping on her stomach, and the intruder turned her over onto her back. B started to scream, and the intruder told her to shut up or he would kill her. The intruder put his hands around her neck and choked her. He then used one hand to rip off her underwear and stuffed a sock in her mouth. The intruder pushed B's legs apart with his legs and raped her. He choked her throughout the rape until she almost passed out.

When the intruder had finished raping B, he told her to stay in bed or he would kill her. He then climbed

---

[1] We protect the identity of the victim, as did the trial court.

out the window. B called the police at 2:20 a.m. She told them that the intruder was a black male, slightly heavier than average, brown-skinned, with a short beard that looked like it was just growing in, and teeth missing from the front of his mouth.

B believed that the man who raped her was the defendant, Jonathan Henry, but she was too afraid to tell this to the police. B had previously seen the defendant around her neighborhood and knew his sisters, but she was not acquainted with him. Two days after the rape, B saw the defendant standing in front of a building in Southfield Village and identified him as the man who had attacked her. B subsequently selected the defendant's photograph from an array of photographs and later made an in-court identification of the defendant as the man who had raped her on March 6, 1982.

Following the state's offer of proof and the arguments of counsel, the court indicated that it would reserve decision until the following day but advised that if it decided to permit the state to introduce the prior crime evidence, it would limit B's testimony regarding the sexual assault in response to the defendant's claim that the circumstances of the crime were inflammatory. The court stated: "If I were to allow this evidence in, I'd find the following circumstances as far as similarities go, because the question might come in, why would someone enter a building in a highly populated area, well lit, corner buildings on streets in Southfield Village at this hour in the night through the second floor in a building that is occupied?"

The trial court then stated what it considered to be the similarities in that "(1) both homes were in Southfield Village and were occupied at the time of the break-in; (2) in both cases, entry was made during the early morning hours; (3) both houses were end units in buildings located on public streets; (4) in each case, entry

and exit were made through a second-story, sliding window of a two-story house connected to other houses; (5) the area around each house was very well illuminated; (6) the intruder had to be agile enough to climb onto an awning from a short brick wall in B's case, and from a fence post in the present case, in order to gain access to the window; (7) the area each house was in was highly populated; (8) both victims gave firm identifications that were particularized with regard to the intruder's facial features; (9) in each case, the victim later spotted the intruder lurking in Southfield Village; and (10) both victims were nineteen-year-old black females."

The trial court stated: "So there are, despite the defendant's contention to the court, extraordinary and striking similarities of a bold entry in a public, [illuminated] area of a corner building on a second floor in early morning hours, into a room, occupied by a young female, by someone agile enough to climb onto the roof and get into the building. . . . [M]y present thinking is these circumstances are very similar, strikingly so. So I would not call this a run of the mill-type entry in the night season—usually those entries are made in covert situations, in dark places that are not illuminated, when one is sure that the building may not be occupied or the residents may be asleep. In each case, the victim was asleep, and was awakened by the intruder. So there are striking similarities."

The court noted that, in regard to identity, the circumstances were "strikingly similar" and that "the person who committed the previous crime in a rather extraordinary manner and was identified by that previous victim, may very well be the person who committed the present crime in the same extraordinary manner. At least it's something for the jury to give consideration to." Regarding intent, the court stated: "[T]he state must prove that the defendant had some intent. And evidence of having

committed a sexual assault without all of the surrounding circumstances would be probative as to why a person would in the early morning hours enter into a bedroom of a young female in a relatively illuminated place in this manner, other than to commit burglary."

On the following day, the court ruled: "After considering this matter overnight, I have determined that the similarities between the incident described by [B] and the incident and the description in the present case by the present victim are so unique, as to warrant a reasonable inference that the person who performed one [misdeed] also did the other, if the jury [decides] to give credit to the testimony of [B]. . . . In balancing the issue as to the probative value of this matter, together with the prejudicial effect of the introduction of the evidence, I'm going to limit the testimony of [B] to those aspects of her experience that would weigh on the two issues that the state claims that this testimony's being introduced for. That is for identity and for intent. . . . Insofar as the state claims that the intent which the evidence is being introduced for would be intent to commit a sexual assault, I'm going to limit [B's] testimony, not to the horrendous experience she underwent with regard to the actual actions, but to a statement that she was threatened and assaulted sexually, period, without describing the course of conduct that occurred. . . . I believe that that will remove some of the prejudicial aspects of the introduction of the earlier evidence. Also, there is a time gap of almost ten years. Now, the court is cognizant, but the jury will not be made aware of the fact that most of that time was accounted for by the defendant being incarcerated for various other crimes; not only the [B] crime, but for other offenses. The jury will not, unless on some other basis, hear about these previous convictions. And I will instruct the jury that [the] passage of ten years might very well affect [B's] ability to adequately recollect the

items that she testified to. I think not allowing the jury to be informed [as] to the fact that the time gap was attributable primarily to the defendant's incarceration will remove some of that prejudicial aspect.

"Finally, I will give a specific charge, both at the time of the introduction of [B's] testimony, and at the time of the final charge, that will limit their consideration of that testimony, solely for the purposes for which it was introduced. So, I think, under these circumstances, the probative value being offered, especially with regard to the establishment of identity, limited as I have indicated I will limit it, and surrounded by the specific instructions, [out]weighs the prejudicial value, obviously, that any of the introduction of testimony would have."

Prior to the introduction of B's testimony, the trial court instructed the jurors that her testimony was not to be considered by them for the purpose of showing that the defendant is of bad character, or has a propensity or disposition to commit crimes of any sort. The court concluded: "[T]he state has offered this and is offering this testimony, and you may consider it only insofar as it might assist you in determining one or more of the elements of a crime. And specifically the state claims, and it is only the claim of the state, that [B's] testimony might be of assistance to you in determining the identity of the assailant in the present case, or the intent of the assailant in the present case, if you find it was of the alleged burglar in the present case, or the intent of the alleged burglar in the present case, if you find there was such a person."

Following B's testimony, the trial court instructed the jury that her testimony "has not been admitted, nor should you consider it, for the purpose of showing that the defendant in this case is a man of bad character, or a man who has a propensity or disposition to commit

the crime of burglary. It is neither a rule of law, nor of logic or of common sense, to say that if a man had once committed a crime and you come to that conclusion, or is a man of bad character, and you come to that conclusion, that he must be guilty of any crime that anyone charges against him at [a] subsequent date. The evidence presented by [B] is only to be utilized by you, in the event you give weight and credit to that evidence, as to whether or not you might logically infer facts tending to prove the identity of the alleged assailant or the identity of the alleged burglar, or the purpose of the alleged entry in the case involving [the victim here]. And I remind you again, that the incident described by [B] occurred over ten years ago. And that quite often the passage of time does affect one's ability to recall events accurately."

The defendant claims that the trial court improperly admitted the evidence of the sexual assault of B either as to identity or as to intent.

" 'As a general proposition, evidence of guilt of other crimes, because of its prejudicial nature is inadmissible to prove that a defendant is guilty of the crimes with which he is charged.' " *State* v. *Baldwin*, 224 Conn. 347, 354, 618 A.2d 513 (1993). Evidence of a defendant's prior misconduct is admissible provided that it is relevant and material to intent, identity, malice, motive, a system of criminal activity or the elements of a crime and, also, that the probative value of that evidence outweighs its prejudicial effect. *State* v. *Cooper*, 227 Conn. 417, 424–25, 630 A.2d 1043 (1993). The determination of whether the probative value of evidence outweighs its prejudicial effect is made in the exercise of judicial discretion, and will not be disturbed on appeal absent clear abuse of discretion, with every reasonable presumption given in favor of the trial court's ruling. *State* v. *Woodson*, 227 Conn. 1, 17, 629 A.2d 386 (1993).

The high degree of similarity required for admissibility on the issue of identity is not required for misconduct evidence to be admissible on the issue of intent. *State* v. *Mooney*, 218 Conn. 85, 132, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). On the issue of identity, however, use of evidence of other crimes or misconduct depends on whether the methods used are sufficiently unique to warrant a reasonable inference that the person who did one also did the other. *State* v. *Ibraimov*, 187 Conn. 348, 354, 446 A.2d 382 (1982). Once this threshold has been satisfied, the trial court must then balance the probative value against the prejudicial effect of the evidence and, before admitting it, must find that the former outweighs the latter. *State* v. *Crosby*, 196 Conn. 185, 190, 491 A.2d 1092 (1985). More than a high degree of similarity is required; the common features must be sufficiently unique. *State* v. *Murrell*, 7 Conn. App. 75, 81, 507 A.2d 1033 (1986). The similarities must be viewed as a whole. "It is the distinctive combination of circumstances and actions which forms the 'signature' or modus operandi of the crime . . . and it is this 'criminal logo' which justifies the inference that the person who committed one offense committed the other." (Citations omitted.) *State* v. *Carsetti*, 12 Conn. App. 375, 382, 570 A.2d 1095, cert. denied, 205 Conn. 809, 532 A.2d 77 (1987).

Our review of the record leads us to conclude that the trial court properly determined that evidence of the sexual assault of B was relevant and material to the issue of identity. While no one circumstance is sufficiently unique to warrant an inference, we nevertheless recognize, as did the trial court, the distinctive combination of circumstances that may justify such an inference by the trier of fact. Both victims were nineteen year old black females who knew the defendant's sisters, and both were able to identify the intruder as a black male with short hair on his head and face. In addition,

as recognized by the court, there were similarities regarding the houses, the time of day, method of entry, lighting conditions, location of each incident, and subsequent observations of the intruder by both victims in Southfield Village. The trial court also recognized that the nature of both crimes demonstrated a certain boldness or bravado that was highly unusual. The intruder made no effort to disguise his face and had to be agile to enter these occupied end units connected to other houses in a highly populated and very well illuminated area. He subsequently appeared publicly in the same neighborhood. The trial court properly determined that the similarities between the two crimes were so distinctive as to warrant an inference that was relevant and material to the issue of identity.[2]

In balancing the probative value of the evidence against its prejudicial tendency, the trial court considered the probability and degree to which the jury might be inflamed by the evidence, and ruled that B's testimony concerning the assault would be limited to the fact that the defendant had threatened and sexually assaulted her, without any additional details. The court also ruled that the jury would not be informed that the defendant had been convicted of and incarcerated for other crimes.[3] The court also ruled that it would instruct the jury that the passage of ten years may have affected B's ability accurately to recollect the sexual assault,[4] and that it would supply limiting instructions regarding B's testimony.[5] We cannot find an abuse of discretion

[2] Having so concluded, we find it unnecessary to review the court's determination that evidence of the sexual assault of B was relevant and material to the issue of intent.

[3] The fact of the defendant's arrest and subsequent conviction for the sexual assault of B was also not disclosed to the jury.

[4] The defendant does not raise remoteness as an issue of relevancy; he concedes that he was incarcerated during most of those ten years.

[5] The court instructed the jury, before and after B's testimony and again in the final charge, that this testimony could not be considered for the purpose of showing that the defendant was a person of bad character or

in view of the careful consideration by the court in its balancing process and its efforts to reduce, as much as possible, the prejudicial effect of that evidence.

We conclude that the trial court acted properly and did not abuse its discretion in determining that the evidence was relevant and material and that the probative value of the witness' testimony outweighed any potential prejudicial effect on the jury.

The judgment is affirmed.

In this opinion the other judges concurred.

had a propensity to commit crimes. In the final charge the court repeatedly instructed the jury that B's testimony had been admitted for the limited purpose of assisting it on the issues of identity and intent and that it was the jury's function to determine B's credibility and what weight, if any, to give her testimony. The trial court further instructed: "So the evidence of a prior illegal act may be used by you in your deliberations only if you find that that evidence is believable, and only if it tends to support logically and rationally an inference on the issues of intent and identification. If you do not find [B's] evidence believable, or if you do not find that it logically and rationally supports an inference on the issues of intent and identification, then you must disregard that testimony completely.

"So in the event there was any misunderstanding about what I said on the drawing of inferences, I tell you now that just because you find [B's] testimony believable and credible, it does not necessarily require that you would draw any inference with regard to the situation involving the present crime alleged on behalf of [this victim]. You may draw that inference if you find that you can draw such an inference logically and credibly, but you are not mandated to draw any such inference."