STATE OF CONNECTICUT *v.* JOSE L. ABRAHANTE
(AC 18611)

Foti, Landau and Dupont, Js.

Argued September 24—officially released December 14, 1999

*Jerald S. Barber*, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David P. Gold*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Jose L. Abrahante, appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), two counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), and six counts of risk of injury to a child in violation of General Statutes § 53-21. On appeal, the defendant claims that the trial court abused its discretion in (1) allowing certain witnesses to testify as to the victim's prior consistent statements, (2) admitting evidence regarding the defendant's uncharged misconduct and (3) refusing to charge as requested on the credibility of child witnesses. The defendant also claims that he was deprived of a fair trial because of prosecutorial misconduct committed during summation, and that the court improperly

charged the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1994, the victim, E, a ten year old girl, was a participant in a preschool day care program where the defendant was employed as a teaching assistant. During a school vacation in April, 1994, the students and teachers involved in the program went to a park. At some time during a hike up to a tower in the park, the defendant and E were alone on the trail. E asked the defendant how many times he had had sex, and the defendant replied, "[fifty] to [100] times." She then asked him how many times he had had a "blow job," and he told her, "About [fifteen] times." The defendant asked her "if [she] knew different sexual positions." E said that she did not and tried to change the subject because she felt "stupid."

A few days later, one of the teachers in the program found a pocketbook that E had left behind when she went to class. Inside the pocketbook was a diary in which E discussed her conversation with the defendant at the park. The teacher gave the diary to Judy Kenney, the director of the day care program, who called E's mother and arranged to meet with her the next day. At that meeting, Kenney told E's mother about the diary entry. When her mother confronted her, E admitted that the conversation had taken place. In addition, E's mother learned from Kenney that the defendant had admitted answering E's questions. She therefore asked Kenney to "keep a close eye on the situation" and to make sure that E and the defendant were kept apart.

On March 28, 1995, the defendant and E were alone again in a storage closet that was also used as an office and a kitchen area for the day care program. The defendant told E that he had a "secret" that had happened five minutes ago. He said that his secret was that E had

bent over and he had seen down her shirt. The defendant then asked E to pull the top of her shirt down, but she refused. He then fondled E's breasts through her clothes.

After this first incident of sexual contact, the defendant's relationship with E intensified. He continued to meet E in the storage closet and devised a system for meeting E in a stairwell near the gymnasium, where the day care program was held. The defendant would tell E to get permission to use the girls' bathroom, which was off the hallway outside the gym. He would then walk by the bathroom and jingle his keys. From this signal, E knew to meet the defendant in the stairwell at the end of the hallway.

On the stairs and in the closet, they engaged in a variety of sexual activities three to four times a week. The defendant lifted up E's shirt and bra and kissed and rubbed her breasts. He also put his hands inside E's pants and underpants, touching her private area and putting his fingers inside her. He also asked E to touch and "lick his dick." At first, E refused to perform oral sex, but she subsequently complied. Although the defendant did not ejaculate during oral sex, he sometimes ejaculated into a tissue when E was touching him.

During this time, the defendant made repeated comments to E about her developing breasts. On one such occasion, the defendant was whispering to his cousin, who also worked at the day care program. E asked the defendant what he was whispering about, and he told her that he had asked his cousin whether he thought that she was wearing a bra. The defendant also told E that other staff members had asked him if he knew whether she "stuffed her bra." He repeatedly asked E what color her bra was.

On June 12, 1995, the defendant met E in the closet and told her to wear loose clothing or sweatpants the

next day so that he could have vaginal intercourse with her. When E got home later that day, however, she was confronted by her parents, who had learned that she had been telling her friends about her relationship with the defendant. Although E denied that anything had happened and said that her friends were lying, E's mother immediately removed her from the day care program, and she had no further contact with the defendant.

A few days later, E was interviewed by Peggy Hartman, a social worker from the department of children and families (department). E denied that she had had sexual relations with the defendant. She repeated this denial a third time to Nancy Frieberg, a psychologist who also interviewed her.

In February, 1996, E was brought to the police station by her parents. There, E met with Pam Kudla, a crisis intervention specialist working primarily with victims of sexual abuse. E told her some of the details of her relationship with the defendant. She refused, however, to give a formal written statement. Kudla told E that she could come back when she was ready "to talk about it again" and gave her the telephone number for a crisis hot line.

Later that month, E and her friend, J, called the hot line and spoke with Trishia Orozco. E told Orozco some of the specifics of what the defendant had done to her and said that she could not decide whether to give a statement against the defendant to the police. Orozco spoke with E for about one hour, after which she immediately contacted the department.

On October 16, 1996, E gave Kudla and police officer Terry Smyth a written statement describing what the defendant had done to her.

I

The defendant claims that the trial court improperly allowed three witnesses to present testimony as to the victim's prior consistent statements.

Certain additional facts are necessary for the resolution of this issue. During the cross-examination of E, defense counsel inquired about apparent inconsistencies between E's trial testimony and her prior statements setting forth specifics regarding what she had told both Kudla and Orozco. He suggested that perhaps she had fantasized the allegation to make herself look more mature.

Thereafter, the state sought to introduce testimony from Kudla, Orozco and J, who was with E during her telephone call to Orozco, detailing E's prior statements. The defendant objected when Kudla's testimony was offered. The trial court overruled the defendant's objection, stating that because the thrust of the defendant's cross-examination of E was inconsistency and fabrication, Kudla's testimony was admissible "for a limited purpose, just so [the jury] can compare the details of this complaint with all the other instances or versions of it to see if it is inconsistent or consistent."

Accordingly, the trial court instructed the jury that Kudla's testimony could be used to "compare the testimony on the stand by [E] to what [E] said, whenever she said it, to see if the stories are consistent and in that way you can judge the credibility of the complaining witness here, are the stories consistent or inconsistent and then by using the testimony in that way you can decide if the witness is credible." The court further instructed as follows: "So, you use it, you use this testimony for evaluating the credibility of the complaining witness. It is not like the witness is up here testifying.

The witness did testify in this case and on direct examination testified about what happened. That's direct evidence of her complaint. This witness could not give you direct evidence of this event because she was not there. She is telling you details that were repeated to her so that you can compare the details with the testimony that was produced [from E]."

Following Kudla's testimony, Orozco and J testified, without objection by the defendant,[1] regarding E's statements.

In its final instructions, the trial court reminded the jury that it could use evidence of E's prior statements "to corroborate her testimony in court. It is to be considered by you only in determining the weight and credibility of [E's] testimony. The fact that [E] made these statements is not being offered to prove that it happened. It is for a different reason. It is being offered to corroborate her testimony here in court. In determining the extent of such corroboration in her statements out of court you will carefully consider all the circumstances under which they were made, and particularly you should consider whether she has been constant and consistent in what she has said."

The court further instructed the jury that, "[i]n addition to the purpose of corroborating her testimony, [E's] out-of-court statements may be used for the purpose of impeaching her testimony and both sides argued each way in this regard. Therefore, you may rely on any contradictions and inconsistencies or falsities which you find in the complainant's out-of-court statements. You can use those in assessing the weight and credibility of her testimony."

[1] Because the defendant failed to object, his claims as to Orozco's testimony and J's testimony are unpreserved. Because these unpreserved claims are evidentiary and not constitutional in nature, we will not review them. *State* v. *Middlebrook*, 51 Conn. App. 711, 721, 725 A.2d 351, cert. denied, 248 Conn. 910, 731 A.2d 310 (1999).

Our Supreme Court in modifying the constancy of accusation doctrine limited the testimony of a person to whom a sexual assault victim had reported such a crime "to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator." *State* v. *Troupe*, 237 Conn. 284, 304, 677 A.2d 917 (1996). "The trial court, in its discretion, may admit into evidence a prior consistent statement of a witness who has been impeached by a prior inconsistent statement for the purpose of rehabilitating the witness. *State* v. *Valentine*, 240 Conn. 395, 413, 692 A.2d 727 (1997)." *State* v. *Mitchell*, 54 Conn. App. 361, 370–71, 738 A.2d 188, cert. denied, 251 Conn. 910, 739 A.2d 1250 (1999). In adopting the rule in *Troupe*, our Supreme Court stated that "the rule that we adopt today does not affect those cases in which the details of a sexual assault complaint are otherwise admissible, as, for example, in the case of a spontaneous utterance or in the case of a prior consistent statement admitted to rebut a claim of recent fabrication." *State* v. *Troupe*, supra, 304 n.19.

The defendant's cross-examination of E brought forward apparent inconsistencies between her prior statements and her testimony on direct examination. Kudla's testimony was offered by the state as necessary for rehabilitation purposes to show the inconsistent statements in "context and to prevent the jury from being misled." *State* v. *Hines*, 243 Conn. 796, 808, 709 A.2d 522 (1998).

The defendant has failed to demonstrate that the trial court abused its broad discretion in admitting Kudla's testimony for purposes of showing E's prior consistent statements.

## II

The defendant next claims that the trial court improperly admitted evidence of prior uncharged misconduct through the testimony of two children, K and C,[2] sisters who were enrolled in the day care program with E.

Additional facts necessary for the disposition of this claim are as follows. In the present case, the trial court held a hearing, out of the presence of the jury, after it had heard the state's offer of proof.

The state's proffered testimony of K showed that the defendant was "real touchy feely" and often played with K's hair and asked her to kiss him. K did kiss the defendant once or twice on the cheek. At one time, the defendant asked K what color her bra was. When K called him a pervert and said that he should not be asking little girls questions like that, he replied that it was none of her business. Sometime later, K saw a sketch of someone who looked like E that the defendant had drawn, unclothed showing her breasts and private parts. E admitted to K that she was "doing things" of a sexual nature with the defendant. Sometime thereafter, the defendant asked K if she wanted to "do the same stuff with him that he was doing with E."

The state's proffered testimony of C showed that the defendant was "very touchy feely" and would ask the girls to sit on his lap, play with their hair and kiss them on the cheek. He asked C to kiss him on the lips and when she did he asked for "more" which C understood to mean "tongue kiss" which she refused to do. C testified that the defendant telephoned her at home several times. On one occasion he asked her what she was wearing underneath her outer clothes, and when she

---

[2] K was the same age and in the same grade as E; C was one year older and one grade ahead.

said a bra and underpants she felt uncomfortable and ended the conversation.

A hearing followed the offer of proof, after which the trial court ruled that only a limited portion of K and C's testimony would be allowed before the jury. The court disallowed most of K's testimony except as to the defendant's seeking to "do the same stuff with him that he was doing with E." The court found such evidence relevant and more probative than prejudicial, similar to the offense and involving a person similar to the witness. The court allowed it as an admission.

As to C's testimony, the court limited the evidence to her testimony only as to the kiss on the lips and request to go further, as falling into the exception on intent. The court also allowed C to testify as to her telephone conversation with the defendant.[3]

Following the testimony of K, the trial court instructed as follows: "When a person admits complicity or responsibility for an act, it is called an admission and that can be shown. A person's statement acknowledging responsibility for a criminal act can be shown. You have to be satisfied that the statement was a true admission, and to reach that conclusion in this case I think it is fair to say you would have to conclude, based on the evidence and your evaluation of the testimony and evaluation of credibility . . . that [K] and the defendant were talking about the same thing. That's your job to decide that. The same thing, what I mean by that is the stuff that was referred to, you're the ones that have to decide what that meant and whether they both were talking about the same thing. That's what jurors do.

"If you decide that they were both talking about the same thing, then you might consider that an admission

---

[3] The defendant does not challenge the court's ruling regarding the telephone conversation.

on his part. But only for that purpose. Normally testimony about other conduct of the defendant is not allowed. Other conduct other than what he's charged with is not allowed unless it is relevant on some point in the case. If you believe the testimony was a request on the part of the defendant to engage in the same type of activities that he's charged with engaging in with [E], then you could use this testimony . . . as evidence not of his bad character or propensity to commit a crime but only for evidence on whether or not he intended to commit the acts with which he's charged in the information."

Following C's testimony, the court instructed: "This is testimony admitted for a limited purpose, not to show bad character or propensity to commit a crime, but the testimony about the conversation about kissing and the actual kissing is admitted on the issue of the intent, the defendant's intent to commit the crimes charged. The testimony . . . with regard to the phone conversation about the bra and the underwear, if you believe that conversation took place, then you might use that to determine well, if a person did this, does it reflect on the question of whether they did the crime charged, is there a common scheme here . . . that's what the state is attempting to show here. It is only if you believe this testimony. The credibility of witnesses is completely up to you."

At the completion of the trial, the court in its final charge to the jury instructed that the testimony of K and C, if believed, could be used only to show intent or common scheme. The court instructed on "intent" and "common scheme" and specifically admonished the jury not to use K and C's testimony as evidence that the defendant is a "bad person."

"As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty

of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Citations omitted.) *State* v. *Kulmac*, 230 Conn. 43, 60, 644 A.2d 887 (1994). Exceptions to the general rule exist, however, "if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime." (Internal quotation marks omitted.) *State* v. *Adorno*, 45 Conn. App. 187, 191–92, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997); *State* v. *Figueroa*, 235 Conn. 145, 162, 665 A.2d 63 (1995). "We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its prejudicial effect." (Internal quotation marks omitted.) *State* v. *Kulmac*, supra, 61; *State* v. *Figueroa*, supra, 162.

"The primary responsibility for making these determinations rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." *State* v. *Kulmac*, supra, 230 Conn. 61; see *State* v. *Figueroa*, supra, 235 Conn. 162; *State* v. *Mooney*, 218 Conn. 85, 126, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

A

The trial court properly allowed the state to present testimony from K regarding the defendant's asking to do "the same stuff" with her what he was doing with E. We agree that the evidence was admissible as an exception to the general rule either as an admission or as evidence of a common scheme, plan or pattern of conduct.

The jury could reasonably infer that the defendant's proposition to K was an admission that the "stuff" he was doing with E was sexual in nature. It was therefore relevant and material.

Evidence of prior misconduct with persons other than the prosecuting witness is admissible to show a common design or plan where the prior offenses (1) are not too remote in time, (2) are similar to the offense charged and (3) are committed upon persons similar to the presenting witness. *State* v. *Esposito*, 192 Conn. 166, 169–70, 471 A.2d 949 (1984); *State* v. *Walsh*, 52 Conn. App. 708, 717–18, 728 A.2d 15, cert. denied, 249 Conn. 911, 733 A.2d 233 (1999). The trial court must determine whether the probative value of such evidence outweighs its prejudicial effect and, if admitted, give an appropriate limiting instruction. *State* v. *Tirado*, 21 Conn. App. 449, 452, 574 A.2d 252, cert. denied, 215 Conn. 816, 576 A.2d 546 (1990).

Our review of the record discloses that the time and similarity to person and to offense can be seen as highly probative of the defendant's continued course of sexual misconduct. The court did not abuse its discretion by finding that the probative value of the evidence outweighed the prejudicial effect. The court also gave an appropriate instruction. The court did not abuse its discretion in allowing K's testimony.

B

The challenged testimony of C regarding a "kiss on the lips" and "more" was properly admitted for the purpose of establishing intent.

"Evidence of other misconduct . . . may be allowed for the purpose of proving many different things, such as intent . . . ." (Internal quotation marks omitted.) *State* v. *Middlebrook*, 51 Conn. App. 711, 715–16, 725 A.2d 351, cert. denied, 248 Conn. 910, 731 A.2d 310

(1999). While this evidence is prejudicial to the defendant, he has failed to convince us that the prejudice outweighed the probative value.

"Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993). When a trial court determines whether it will allow such evidence, it needs to examine the similarities between the prior conduct and the current crime. *State* v. *Henry*, 41 Conn. App. 169, 178, 674 A.2d 862 (1996).

In any event, the evidence offered also was admissible under another approved exception to the general rule, namely to show a common scheme, plan or design. See *State* v. *Madore*, 45 Conn. App. 512, 517–22, 696 A.2d 1293 (1997). "It is well settled that evidence of prior misconduct is admissible for the limited purposes of showing intent, an element in the crime, identity, malice, motive or a system of criminal design." *State* v. *Taylor*, 239 Conn. 481, 501, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). The courts of this state "are more liberal in admitting evidence of [prior uncharged misconduct] to show a common scheme or pattern in sex related crimes than other crimes." *State* v. *Kulmac*, supra, 230 Conn. 62.

The defendant's conduct toward C was similar in nature to his actions involving E. The age of both, his access to each through his employment, and the time period involved along with other similarities lead us to conclude that the trial court did not abuse its discretion in allowing C's testimony. Exercising every reasonable presumption in favor of sustaining the trial court's decision, we cannot say that abuse of discretion is manifest.

## III

The defendant alleges that the trial court abused its discretion in failing to instruct the jury as requested on

the credibility of child witnesses.[4] In charging the jury, the court instructed generally on the credibility of witnesses.[5] The defendant argues that under the circumstances of this case, with four of the state's witnesses being children, he was entitled to such a charge. We disagree.

[1] The defendant filed the following request to charge: "In weighing the testimony of a child, you should also take into consideration her youth. In certain respects, a child is more apt to err than an older person; she is apt to be more amenable to any influence or suggestion which may be made to her by an older person and particularly persons closely related to her, and may try to avoid causing such persons to be angry with her. [Their] imaginations often also mislead them; its product may take on all the semblance of actual fact and they will relate them as such. The sanctity of the oath and the solemnity of legal proceedings may appeal to them less than to an adult. On the other hand, motives of interest and ultimate design or purpose often sway her less than they do an adult. Perhaps these suggestions by me are sufficient to indicate to you that in weighing the testimony of a child, her youth is a factor you should not overlook, and to make clear that you should apply your own experience and knowledge of childhood. . . .

"The capacity and intelligence of a child, her understanding of the difference between truth and falsehood, and her appreciation of the duty to tell the truth and, in a general way, belief that failure to perform that obligation will result in punishment, are ingredients which you should consider in assessing the testimony of a child."

[5] The trial court instructed as follows: "In deciding what the facts are, you must consider all the evidence. In doing this you must decide which testimony to believe and which testimony not to believe. You may believe all, none or any part of any witness' testimony. In making that decision you may take into account a number of factors including the following: (1) was the witness able to see or hear or know the things about which that witness testified; (2) how well was the witness able to recall and describe those things; (3) what was the witness' manner while testifying; (4) did the witness have an interest in the outcome of this case or any bias or prejudice concerning any part of any matter involved in this case; (5) how reasonable was the witness' testimony considered in light of all the other evidence in the case; and (6) was the witness' testimony contradicted by what that witness has said or done at another time or by the testimony of other witnesses or by other evidence.

"If you think that a witness on the stand has deliberately testified falsely in some respect, you should carefully consider whether you should rely upon any of that witness' testimony. In deciding whether or not to believe a witness keep in mind people sometimes forget things. You need to consider therefore whether a contradiction is an innocent lapse of memory or an intentional falsehood and that may depend on whether it has to do with an

At the time of the trial, the four, E, J, K and C, were either thirteen or fourteen years old. Prior to 1989, a special cautionary charge on the credibility of a child witness had to be given when requested. *State* v. *Anderson*, 152 Conn. 196, 198, 205 A.2d 488 (1964). *Anderson* was expressly overruled when our Supreme Court adopted the prevailing view that allows the trial judge to exercise his or her discretion in determining whether the jury should receive such a special instruction, and, if so, its nature. *State* v. *James*, 211 Conn. 555, 570–71, 560 A.2d 426 (1989).

No abuse of discretion was found in such matters where the victim was twelve years old at the time of trial. Id., 571; see *State* v. *Hayes*, 20 Conn. App. 737, 748, 570 A.2d 716, cert. denied, 215 Conn. 802, 574 A.2d 218 (1990). Nor was an abuse of discretion concluded where the witness or victim was between eleven and thirteen years old. *State* v. *Angell*, 237 Conn. 321, 330–31, 677 A.2d 912 (1996) (twelve years old); *State* v. *Osborn*, 41 Conn. App. 287, 290, 676 A.2d 399 (1996) (eleven and thirteen years old).

The defendant does not claim that the instruction on the credibility of witnesses in general was per se improper, and he cannot demonstrate that the trial court abused its broad discretion in refusing to instruct as requested.

IV

The defendant next argues that he was deprived of a fair trial because of prosecutorial misconduct during summation. Specifically, he claims that the prosecutor appealed to the jurors' emotions in his closing argument when he described the role of children in the courtroom.

important fact or with only a small detail. These are some of the factors you may consider in deciding whether to believe testimony."

The defendant did not object at trial; he raises this claim for the first time on appeal. Although he does not seek review by invoking the guidelines of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), we review the defendant's claim because there is an adequate record and the claim is of constitutional dimension. After a thorough review of the closing arguments of the defendant and the state, we conclude that the descriptions of the child witnesses by the state were based on the evidence and made in response to the defendant's argument, were not improper and did not deprive the defendant of a fair trial.

V

The defendant's final claim is that the trial court improperly instructed the jury when it predicated the defendant's conviction of four of the counts of risk of injury to a child on the sexual assault charges. We find no merit to the claim and deem it unnecessary to set forth in any detail the court's instruction. Our review of the instruction shows that the court merely informed the jury that certain charges were based on identical factual allegations for the purpose of ensuring that the jurors clearly understood the charges being submitted to them for their consideration. The jury was instructed that each charge should be considered separately. At no time did the court expressly or implicitly state that if the jury found the defendant guilty of any count of sexual assault it had to find him guilty of the factually related risk of injury charge. The primary purpose of a charge is to assist the jury in applying the law correctly to the facts that it has found proven, and to call the attention to the members of the jury, unfamiliar with legal distinctions, of whatever is necessary and proper to guide them to a correct decision in the case. *State* v. *Sanchez*, 50 Conn. App. 145, 153–54, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998). We conclude that the court's jury instructions achieved

their purpose of assisting the jury in applying the law. We also conclude that it was not reasonably possible that the jury was misled; no injustice to the defendant resulted by reason of the court's instruction.

The judgment is affirmed.

In this opinion the other judges concurred.