STATE OF CONNECTICUT *v.* RADCLIFFE RAYNOR
(AC 23542)

Lavery, C. J., and Flynn and DiPentima, Js

Argued April 2—officially released August 31, 2004

*Martin Zeldis*, assistant public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *James E. Thomas*, state's attorney, and, on the brief, *Sandra L. Tullius*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Radcliffe Raynor, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (2). On appeal, the defendant claims that the trial court abused its discretion by (1) admitting evidence of certain of his actions and words as misconduct that the jury could use to determine whether he had the motive and intent to commit the charged crimes, (2) determining that the evidence of his actions and words were relevant and material and that their probative value was not substantially outweighed by their prejudicial effect, and (3) allowing testimony from a police officer that another state's witness had told him that the defendant "had a thing for young girls," even though the other state's witness did not testify as to that matter. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In November, 1999, the thirteen year old victim[1]

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

resided with her mother in an apartment in Hartford. The victim and her mother regularly attended a church located next door to their apartment. One night in November, the victim's mother left the apartment to attend a meeting at the church, leaving the victim alone. On her way to the church office, the victim's mother encountered the defendant, a relative, who asked to use the telephone in the apartment. After initially denying the defendant's request to use the telephone, the victim's mother asked the victim to open the door to the apartment for the defendant. The defendant indicated to the victim's mother that he would stay with the victim until she returned from the church meeting. The victim's mother told the defendant that that would be good and that she would return in about one and one-half hours.

After opening the door to the apartment for the defendant, the victim went to her room to watch television while the defendant used the telephone in the living room. After the defendant finished using the telephone, he entered the victim's bedroom. The defendant began to speak to the victim about his wife. As he did so, the defendant stood toward the end of the victim's bed as she was lying on it. After speaking with the victim about his wife, the defendant asked the victim to give him a hug. The victim then stood up from her bed and hugged the defendant. She sat down on the edge of her bed. The defendant asked the victim to hug him again and the victim complied, although this time, she described the hug as "uncomfortable" because she could feel the defendant's "private part." The defendant pushed the victim down on her bed. While holding both of the victim's hands with one of his hands, the defendant pulled down the victim's pajamas and underwear. As the victim screamed and told him to stop, the defendant used his legs to open the victim's legs and inserted his penis inside her vagina. After the defendant removed his penis from the victim's vagina, the victim could see

"white stuff" coming out of his penis onto the carpet and the bed. The defendant went into the bathroom and subsequently left the apartment.

The victim subsequently went to the bathroom and noticed that, at a time when she was not having her period, blood was coming from her vagina. The victim put on a sanitary pad and went back to her room. Before the victim's mother returned home from church, the defendant called to apologize and to tell the victim that she should not tell her mother what had happened because his life was in her hands, that it would cause a big problem for the family and that no one would believe her. When the victim's mother did arrive home from church, the victim was still in her room. The victim's mother came into the victim's room and inquired why the victim had not responded to her when she called her from the living room. The victim's mother noticed a sanitary pad wrapper in the bathroom. The victim's mother asked the victim why, after the victim had had her menstrual period two weeks earlier, she again seemed to "be on her period." The victim did not relate to her mother at that time the incident that had just occurred with the defendant and instead responded that she had been "playing" with herself.

The victim did not tell anyone of the incident with the defendant until sometime after Christmas in late December, 1999, or early January, 2000. At that time, the victim told her cousin that she needed to go to a doctor because she thought something was wrong with her. The victim then disclosed to her cousin that the defendant had raped her. The victim's cousin told her mother, the victim's maternal aunt, who then told the victim's mother that the defendant had raped the victim.

After learning that the victim had been sexually assaulted, the victim's mother took her to the emergency room at Saint Francis Hospital and Medical Cen-

ter in Hartford. There, the victim was given a medical examination, and the incident between the victim and the defendant was reported to the police. The victim subsequently was interviewed by a specialist working primarily with child victims of sexual abuse. That interview was observed by Steven DiBella, a sergeant with the Hartford police department's detective division. During the interview, the victim described the incident that occurred between her and the defendant the previous November. After further investigation and interviews, DiBella arrested the defendant on June 21, 2000.

I

The defendant claims that the court abused its discretion when it improperly admitted as misconduct evidence testimony about certain of his acts pertaining to individuals other than the victim. We conclude that although all of the challenged prior misconduct evidence did not show criminal conduct, the evidence was nonetheless admissible as other acts of the defendant pursuant to Connecticut Code of Evidence § 4-5 (b).

Certain additional facts are necessary for the resolution of the defendant's claim. The court allowed the prosecution to offer the testimony of D, who testified that she was thirteen years old and a friend of the victim at the time of the incidents she related in her testimony. The court characterized D's testimony as prior misconduct evidence in its instruction to the jury immediately after her testimony, as well as in the court's final jury instruction.

D testified that when she telephoned the victim's apartment, the defendant, rather than the victim, answered the telephone. Instead of giving the telephone to the victim, the defendant proceeded to ask D her name and age. When D asked the defendant whether the victim was there or whether she had the wrong number, the defendant told her that she had the wrong

number. D then ended the telephone call and telephoned back. This time, the victim answered the telephone and told D that the defendant was the one who answered the telephone before. D also testified about another occasion when she was on the front porch of the victim's home and the defendant approached in a motor vehicle. D testified that the defendant yelled to her, asking her how old she was. She responded that she was too young for him. The defendant responded by saying that she was not too young for him.

The court also permitted the admission of the testimony of the victim and the victim's mother concerning an incident involving the defendant and one of the victim's friends, which the court labeled as prior acts of misconduct in its final jury instruction. According to that testimony, the victim and the victim's mother witnessed the defendant holding onto S, another of the victim's friends, while S attempted to repel the defendant.

The court also permitted the detective investigating the case, DiBella, to testify, in response to a question by defense counsel on cross-examination and a further question by the prosecutor on redirect examination, that the victim's cousin had told him that the defendant had a "thing for young girls." The court did not mention the testimony in its final jury instructions. The court did, however, in its instruction immediately after DiBella's testimony regarding the victim's cousin, tell the jury that it may consider the testimony as a "sort of thirdhand" alleged misconduct or "statements made about the misconduct on the part of the defendant involving other persons" only on the issues of intent and motive.

Finally, the court permitted the prosecution to introduce into evidence the testimony of J, who indicated that she was thirteen and a friend of the victim at the time of the events she related in her testimony. J testi-

fied that when she and the victim were in the seventh grade, she had accompanied the victim and the defendant to Sears, Roebuck and Company to retrieve a motor vehicle belonging to the victim's mother. At a time when J was alone in the motor vehicle with the defendant, the defendant asked J whether she had a boyfriend, whether she was a virgin and whether he could perform oral sex on her. J also testified that the defendant told her that she "had a nice body for being very young" and that he was going to have sex with another thirteen year old girl, K, with whom J was acquainted. J testified further that the defendant began to touch her on her chest and then tried to put his hand between her legs and only stopped after J slapped his hand away.

At the completion of the trial, the court, in its final charge, instructed the jury that the testimony of D, the testimony of the victim and the victim's mother, concerning the defendant's alleged actions with S, and J's testimony was prior misconduct evidence that could be used only on the "issues of intent and motive and for no other purpose." The court did not, in its final instruction, refer to DiBella's testimony relating the statement of the victim's cousin that the defendant had a "thing" for young girls.

As an initial matter, we set forth our standard of review. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Yusuf*, 70 Conn. App. 594, 608, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002).

We begin our review of the court's action by noting that it is a general rule of evidence that a criminal defendant's prior misconduct is inadmissible to prove guilt of the crime of which the defendant is accused. "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person." Conn. Code Evid. § 4-5 (a); see also *State* v. *Abrahante*, 56 Conn. App. 65, 75–76, 741 A.2d 976 (1999). Nevertheless, "[e]vidence of other crimes, wrongs or acts of a person is admissible for purposes . . . such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5 (b); see also *State* v. *Henry*, 41 Conn. App. 169, 177, 674 A.2d 862 (1996).

Here, the challenged evidence concerns circumstances from which the jury might reasonably infer the defendant's motive and, thus, his intent. "Because intent is almost always proved . . . by circumstantial evidence, prior misconduct evidence, where available, is often relied upon. . . . When a trial court determines whether it will allow such evidence, it needs to examine the similarities between the prior conduct and the current crime." (Citation omitted; internal quotation marks omitted.) *State* v. *Abrahante*, supra, 56 Conn. App. 78.

The defendant was charged with sexual assault in the first degree in violation of § 53a-70 (a) (1),[2] sexual assault in the second degree in violation of § 53a-71 (a)

[2] General Statutes § 53a-70 (a) (1) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

$(1)^3$ and risk of injury to a child in violation of § 53-21 $(2).^4$ Although only some of the challenged prior conduct evidence had enough similarity to the crimes with which the defendant was charged to rise to the level of uncharged criminal misconduct, the remainder of the challenged evidence nevertheless had sufficient similarity to the charged crimes to be relevant and material as other acts within the meaning of Connecticut Code of Evidence § 4-5 (b).

The court correctly determined that the prior conduct evidence showing that the defendant began to touch J on the chest and tried to put his hand between her legs was prior uncharged criminal misconduct. That conduct bears a strong similarity to the element of § 53-21 (2) requiring contact with the intimate parts of a child under the age of sixteen years in a sexual and indecent manner.

With regard to the prior conduct evidence concerning the defendant's telephone conversations with D, his comment that she was not "too young" for him, the incident between the defendant and S in which he was "playing" with her, the comment by the victim's cousin that the defendant had a "thing" for young girls and the defendant's questions to J regarding whether she had a boyfriend, whether she was a virgin, whether he could have oral sex with her and his comment to J that he would have sex with another thirteen year old girl, we

[3] General Statutes § 53a-71 (a) (1) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ."

[4] General Statutes (Rev. to 1999) § 53-21 (2) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

agree with the court that those acts bear sufficient similarity to the crimes with which the defendant was charged in that they express the sexual nature of his interest in thirteen year old girls and were admissible as other acts pursuant to § 4-5 (b) of the evidence code.[5] We reach that conclusion because the court properly was within its discretion to determine that such evidence could be construed reasonably by the trier of fact as inappropriate, sexually suggestive acts directed toward thirteen year old girls within the victim's social circle of friends and relatives that could be indicative of his intent and motive.

In light of the foregoing, we conclude that the court did not abuse its discretion in admitting as evidence certain of the defendant's acts of misconduct pertaining to individuals other than the victim.

## II

The defendant next claims that the court improperly determined that the evidence of his actions and words were relevant and material, and that their probative value was not substantially outweighed by their prejudicial effect. We disagree.

As a preliminary matter, we observe that evidence that makes the existence of a fact that is material to an issue in the case more or less probable, even to a slight degree, is relevant. See Conn. Code Evid. § 4-1, commentary. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Internal quotation marks omitted.)

[5] Ballentine's Law Dictionary (3d Ed. 1969) defines an act as "[a] thing done . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) defines an act as "the doing of a thing: DEED."

*Jewett* v. *Jewett*, 265 Conn. 669, 679–80, 830 A.2d 193 (2003).

In the present case, the challenged prior conduct evidence regarding the defendant's social interactions with the victim and the victim's relatives and friends was relevant and material to his motive and intent to commit the charged crimes. Specifically, the court determined that the challenged prior conduct evidence reasonably could show the defendant's sexual interest in thirteen year old girls that could be indicative of his motive and intent. We agree with the court.

A

Turning first to motive, we note that the challenged evidence is admissible to show, not that the defendant had a propensity to commit the class of crime involved, but to prove that he was attracted sexually to the adolescent female friends and relatives of the victim who were approximately the victim's age. That the defendant had a particular sexual interest in the victim's female friends is certainly relevant to his motivation to commit the crimes of which he was accused. As the court explained, the prior conduct evidence demonstrating a pattern of social interaction with the victim and the victim's relatives and friends tended to indicate a sexual interest in thirteen year old girls that was probative of a reason for the defendant to commit a sexual assault against the thirteen year old victim in this case.

With regard to intent, we recognize that the crimes with which the defendant was charged involve general intent.[6] The state has the burden, therefore, to establish

[6] "Sexual assault in the first degree requires proof of general intent, that is [t]hat the defendant intended to perform the physical acts that constitute the crime of sexual assault." (Internal quotation marks omitted.) *State* v. *Jackson*, 30 Conn. App. 281, 290, 620 A.2d 168, cert. denied, 225 Conn. 916, 623 A.2d 1026 (1993). "Sexual assault in the second degree is a general intent crime that requires only that the actor possess a general intent to perform the acts that constitute the elements of the offense." (Internal quotation marks omitted.) *State* v. *Blake*, 63 Conn. App. 536, 542, 777 A.2d

that the defendant had the general intent to engage in the proscribed act that resulted in the sexual assault of the victim. "General intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness. Where a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts." (Internal quotation marks omitted.) *State* v. *Charles*, 78 Conn. App. 125, 131, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003).

Here, the challenged prior conduct evidence demonstrated the nature of the defendant's behavior toward and social interactions with the victim and the victim's social circle of relatives and friends. That not only showed that he had a sexual interest in thirteen year old girls, but also tended to show that he possessed the requisite general intent to commit a sexual assault on a thirteen year old girl. It is axiomatic that a jury may infer intent from behavior. As our Supreme Court has stated, "direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000). We conclude that the pattern and

709, cert. denied, 257 Conn. 911, 782 A.2d 134 (2001). To prove that the defendant violated General Statutes § 53-21, "the state must establish beyond a reasonable doubt that (1) the victim was less than sixteen years of age at the time of the incident, (2) the defendant performed an act that was likely to impair the victim's morals, and (3) the defendant had a general intent to perform such act." *State* v. *Cansler*, 54 Conn. App. 819, 839, 738 A.2d 1095 (1999).

nature of the defendant's conduct toward the victim and the victim's friends contained in the challenged prior conduct evidence was relevant and material to the question of his general intent to commit the crimes with which he was charged and was, therefore, properly admissible evidence.

B

Having concluded that the court properly ruled that the challenged prior conduct evidence was sufficiently relevant and material to be admitted, we must now address the second prong of our analysis, that is, whether the prejudicial impact of the prior conduct evidence outweighed its probative value. We conclude that it did not.

As an initial matter we set forth our standard of review and the applicable legal principles necessary for our resolution of the defendant's claims. "The determination of whether the probative value of evidence outweighs its prejudicial effect is made in the exercise of judicial discretion, and will not be disturbed on appeal absent clear abuse of discretion, with every reasonable presumption given in favor of the trial court's ruling." *State* v. *Henry*, supra, 41 Conn. App. 177.

"Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." Conn. Code Evid. § 4-3. Prejudice is unfair if it has a tendency to unduly arouse the jury's feelings of prejudice, hostility or sympathy or has an adverse effect "beyond tending to prove the fact or issue that justified [the] admission [of the] evidence." (Internal quotation marks omitted.) Conn. Code Evid. § 4-3, commentary. "The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be

roused by the evidence." (Internal quotation marks omitted.) *State* v. *Yusuf*, supra, 70 Conn. App. 608.

We first address the prior misconduct evidence of the touching incident between the defendant and J. The defendant argues that J's testimony lacked specificity and detail, that his touching her chest and attempting, without success, to put his hand between her legs had little probative value and high prejudicial effect. We disagree.

The record shows that the court carefully considered the prejudicial effects of the evidence concerning the defendant's attempts to touch the intimate parts of J. The court stated that the alleged touching incident between the defendant and J was "highly probative of intent and motive on the part of the defendant, particularly involving a victim of the same age" and that while the touching incident was "unpleasant, it is not so shocking or brutal as to arouse the jury's emotions unnecessarily."

That challenged misconduct evidence, although relevant to the issues of motive and intent, nonetheless involved the touching and attempted touching of the intimate parts of J, the victim's friend, that was stopped only when J slapped the defendant's hand away. The jury heard, in contrast to J's testimony, detailed testimony from the victim concerning the manner in which the defendant sexually assaulted her. Given the graphic nature of the sexual assault testimony, we conclude that J's testimony regarding the touching incident between her and the defendant was unlikely to arouse the jury's emotions of hostility and prejudice. Furthermore, the court was careful to caution the jury with a limiting instruction that the prior misconduct evidence could be used only for purposes of showing intent and motive. Accordingly, we conclude that the court did not abuse its discretion when it determined that the

probative value of the prior misconduct evidence concerning the incident between J and the defendant substantially outweighed its prejudicial effect.

We turn next to the prejudicial effect of the remainder of the prior conduct evidence that constituted evidence of the defendant's other relevant and material acts. We conclude that the court properly determined that the probative value of such evidence substantially outweighed its prejudicial effect.

The remainder of the challenged prior conduct evidence, although relevant to the issues of motive and intent, bore less than substantial similarity to the crimes with which the defendant was charged. The challenged prior conduct evidence nevertheless showed the nature of the defendant's interest in and social interactions with the victim and the victim's circle of friends and relatives as manifested by his behavior, comments and questions.

We note again that the jury heard detailed testimony from the victim concerning the manner in which the defendant sexually assaulted her. Given the graphic nature of the sexual assault, we conclude that the remainder of the challenged prior conduct evidence regarding the nature of the defendant's interest in the victim's circle of friends and relatives was unlikely to arouse the jury's emotions of hostility and prejudice.

We conclude that the challenged evidence was relevant and material to the defendant's intent and motive, that its probative value substantially outweighed its prejudicial effect and, therefore, that it was admitted properly by the court.

### III

The defendant next claims that the court improperly allowed testimony from a police officer that another state's witness had told him that the defendant "had a

thing for young girls," even though the other state's witness did not testify as to that matter. Specifically, the defendant argues that the court improperly allowed, over objection, hearsay testimony from a police officer who claimed that he had been told by another person that the defendant "had a thing for young girls" when that other person previously testified for the state and gave no such testimony. We disagree.

On cross-examination, the following exchange occurred between defense counsel and DiBella:

"[Defense Counsel]: So, really all you know about this case independently really stands from statements made by either [the victim's mother] about what she did or [the victim] about what she did.

"[The Witness]: No.

"[Defense Counsel]: What other information do you have?

"[The Witness]: Other people that I interviewed indicated that—

"[Defense Counsel]: Their information would . . . also be?

"[The Witness]: Other people that I interviewed indicated that [the defendant] had a thing for young girls.

"[Defense Counsel]: Not that they had a thing for young girls because I believe we had those witnesses testifying here. Now, officer, is that really what they said or did they say that [the defendant] had allegedly made what they consider to be inappropriate comments to them? The two girls that you're referring to, is that what they said?

"[The Witness]: No. Actually, I was referring to some other things. I interviewed [the victim's cousin. The

cousin], when I asked her, [the cousin was] an eighteen year old female."

Defense counsel then objected to the answer given to the questions she asked. Notably, the defendant did not object to DiBella's answer that "[o]ther people that I interviewed indicated that [the defendant] had a thing for young girls."

On redirect examination, the state asked, "What did [the victim's cousin] tell you?" to which the defendant objected on the ground of hearsay. The state argued in response that DiBella should be allowed to complete his answer and that the defendant had opened the door on cross-examination to that line of questioning. The court sustained the defendant's objection. The state then rephrased its question from, "What did [the victim's cousin] tell you?" to, "Who told you that the defendant had a thing for young girls?" This time, the court allowed DiBella to answer the question and let the answer stand over the defendant's objection. After a recess in which the court played back the cross-examination and redirect examination, it determined that the defendant did in fact open the door to the line of questioning that was pursued by the state on redirect examination.

At the outset, we set forth our standard of review. "We will set aside a trial court's evidentiary ruling only when there has been a clear abuse of its discretion. . . . The trial court has wide discretion in determining the [admissibility] of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial."

(Internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 515, 820 A.2d 1024 (2003).

"Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject." *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986). "The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . [T]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." (Internal quotation marks omitted.) *State* v. *Greene*, 52 Conn. App. 617, 627, 727 A.2d 765, cert. denied, 248 Conn. 922, 733 A.2d 845 (1999).

In the present case, the defendant opened the door to the state's follow-up question by asking DiBella whether the only information he had about the case came from statements made by either the victim or the victim's mother. DiBella answered no, and the defendant followed up by asking the open-ended question, "What other information do you have?" to which DiBella responded that he had information from other people he had interviewed. The defendant inquired further as to what information DiBella had gathered from the other people he interviewed. DiBella answered that he learned from the other people he interviewed that the defendant "had a thing for young girls." At that point, the defendant objected to the answer that was given by DiBella and stopped questioning him.

In pursuing that line of questioning, the defendant attempted to attack the credibility of DiBella's testi-

mony by suggesting that his knowledge of the defendant's attraction to young girls came solely from two biased witnesses, the victim and the victim's mother. When the defendant received answers from DiBella that did not correspond with the defendant's view of the evidence, the defendant stopped the questioning. Nevertheless, the defendant had opened the door for the state to at least ask DiBella for the names of the persons other than the victim and the victim's mother who had told him that the defendant "had a thing for young girls."

On redirect examination, the state took advantage of the door opened by the defendant. Although the court sustained the defendant's hearsay objection to the first form of the state's question, it did not sustain the defendant's objection to the second form of the question.

Here, we note that to allow the defendant to raise the question of whether DiBella's information regarding certain actions and behavior of the defendant was limited to the interviews he conducted with the victim and the victim's mother and then stop DiBella from answering further when the answers given failed to create the impression the defendant had hoped for would be to allow the defendant to make unfair use of the evidence. For that reason, we conclude that the court properly exercised its discretion in allowing the question and response.

The judgment is affirmed.

In this opinion the other judges concurred.