STATE OF CONNECTICUT *v.* JEFFREY B. WILLIAMS
(AC 26808)

Harper, Rogers and Lavine, Js.

Conn. App. 656, 660, 870 A.2d 1159, cert. denied, 274 Conn. 903, 876 A.2d 13 (2005).

 

Argued February 16—officially released July 3, 2007

*George G. Kouros*, special public defender, with whom, on the brief, were *Richard A. Reeve, Michael O. Sheehan* and *Cyd O. Oppenheimer*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

LAVINE, J. The defendant, Jeffrey B. Williams, was sentenced to thirty-five years in prison after a jury found him guilty of two counts of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1), seven counts of risk of injury to a child in violation of General Statutes (Rev. to 1997 and 1999) §§ 53-21 (1) and (2), and three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2). On appeal, the defendant claims that (1) a pattern of prosecutorial misconduct throughout the trial denied him the constitutional rights to due process and a fair trial,[1] and (2) the trial court denied him the constitutional right to counsel by denying his motion for new counsel. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts on the basis of the evidence presented. Between the spring of 1997 and mid-October, 1999, the victim[2] and her three younger sisters lived with their mother, who was the defendant's girlfriend, her uncle and the defendant at various residences in the city of New Haven. The victim was approximately eight years old when the defendant began to abuse her. The defendant beat her about once a week for a variety of reasons. In November, 1997, the defendant knocked the victim to the floor, causing a spiral fracture of her left humerus. The victim was taken to a hospital, but her mother instructed her and her sisters to attribute the injury

---

[1] This opinion was being prepared for publication when our Supreme Court rendered its decision in *State* v. *Fauci*, 282 Conn. 23, 917 A.2d 978 (2007). Pursuant to *Fauci*, the term "prosecutorial impropriety" is more appropriate than the traditional term "prosecutorial misconduct"; id., 26 n.2; and we will use that term in the future. The parties briefed and argued the defendant's first claim, however, using the term "prosecutorial misconduct" and that is the term used in this opinion.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom her identity may be ascertained. See General Statutes § 54-86e.

to the victim's having fallen off her bed. On another occasion, the defendant banged the victim's head on a sink, breaking one of her teeth. When the victim told her mother of the broken tooth, her mother instructed her to go outside and play. The defendant struck the victim with a wooden paddle and on one occasion gave her a black eye. The victim's mother put makeup on the bruise to cover it. The victim's teacher, however, noticed the makeup and bruise. At another time, the school personnel discovered a hickey on the victim's neck. The victim had told her mother that the defendant had given her the hickey. The defendant convinced her mother that someone else had given the victim a hickey and then beat the victim.

Sometime between August and October, 1999, the defendant placed the victim in a situation that was likely to injure her health. When the victim did not comply with the defendant's instructions, he made her put her head out a window and then he poured water over her head. He made her stay there until it was time to go to school.

At night, the defendant would awaken the victim and take her to his room where he told her to rub his back.[3] Initially, the defendant lay face down but would turn over and instruct the victim to rub his lower body. The defendant took the victim's hand and placed it on his penis, at first outside of his boxer shorts and then inside. The defendant's sexual abuse progressed beyond back-rubs and having the victim touch his penis. The defendant began to grope the victim's vagina, buttocks, thighs and undeveloped chest. On three or four occasions, the defendant forced his penis into the victim's vagina.[4] If

---

[3] The victim's mother was employed at night.

[4] A colored drawing by the victim depicting the defendant on top of her in a bed and the defendant's penis in her vagina was placed into evidence. The victim was depicted crying, and the defendant was shown with a smirk on his face.

the victim asked the defendant to stop, he would tell her not to tell him what to do. The victim bled after the first and second rapes and told her mother, who told her she was having her menstrual period. Although the victim reported the abuse to her grandfather, he refused to believe her. Consequently, the victim did not report the continuing abuse for fear that no one would believe her. The victim eventually disclosed the defendant's sexual abuse to her cousin but implored her not to tell anyone.

In early 2001, the victim, her sisters and mother moved to a homeless shelter in Waterbury, after which the victim and her sisters were removed from their mother's custody by the department of children and families (department). The victim was placed in a foster home. While the victim and her foster mother were watching a television movie about sexual abuse, the victim ran from the room crying. Because the victim was so overcome with emotion, her foster mother waited until the next day to discuss the subject with her. During the conversation, the victim confided that the defendant had raped her and hurt her private parts. The foster mother reported the complaint to a department social worker.

Subsequently, the victim was interviewed by a forensic specialist, examined by a pediatric nurse practitioner and interviewed by a detective, Michael Hunter. The nurse practitioner found a furrow running through the victim's hymen, an injury consistent with penile penetration. Hunter also interviewed the defendant and recorded his statement. According to the defendant, subsequent to his having back surgery, he slept in a hospital bed in the living room where he awoke one night to find the victim stroking his penis. The defendant so informed the victim's mother, who beat the victim. One month later, the defendant again awoke and found the victim fondling his penis. He again reported the

incident to the victim's mother who administered "a whupping." In his statement, the defendant acknowledged having spanked the victim but denied that he ever punched her, hit her, broke her arm or had sexual intercourse with her.

The defendant was arrested and charged on December 5, 2002. The state filed a twelve count long form information. The theory of defense was that the victim lied about the abuse to avoid being returned to the care of her mother. The jury found the defendant guilty of all charges alleged. Additional facts will be set forth as necessary.

I

The defendant first claims that he was denied due process of law and a fair trial due to a pattern of prosecutorial misconduct throughout the trial. The defendant claims that the prosecutor (1) violated the court's order regarding uncharged misconduct evidence, (2) elicited inadmissible evidence from a state's expert witness and (3) argued improperly during summation. Although the defendant failed to object to any of the alleged misconduct, we will review his unpreserved claims pursuant to *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004), and *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Because we conclude that there was no pervasive pattern of prosecutorial misconduct at trial, we do not agree that the defendant was denied due process of law or a fair trial.

The following principles govern claims of prosecutorial misconduct. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair

trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seeks impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. . . .

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 571–72. We apply the *Williams* factors to the entire trial only in instances of misconduct to determine whether a

defendant has been denied the right to due process and a fair trial.[5]

Our Supreme Court has emphasized "the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and . . . continue[s] to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she later wants to refute that argument. . . . Accordingly . . . counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 576.

## A

The defendant claims that the prosecutor violated the court's ruling on uncharged misconduct. Specifically, the defendant claims that the prosecutor offered

[5] "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, [our Supreme Court], in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540. "[A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial." *State* v. *Stevenson*, supra, 269 Conn. 573.

evidence that the defendant allegedly had beaten one of the victim's sisters despite the court's order that such evidence could not be admitted during the state's case-in-chief because it was more prejudicial than probative. The state argues that this claim is not reviewable because it is of an evidentiary nature, not a constitutional one, regardless of the label the defendant attaches to it. The defendant points out, however, that the appellate courts of this state have held that evidentiary violations of a court order should be reviewed as prosecutorial misconduct, not evidentiary errors. See *State v. Sherman*, 38 Conn. App. 371, 384, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995). We will review the claim as "it is the severity of the misconduct, considered in the context of the specific facts and circumstances of a particular case, as opposed to the intrinsic nature of the impropriety, that determines whether an impropriety is evidentiary or of constitutional magnitude." *State v. Santiago*, 269 Conn. 726, 742, 850 A.2d 199 (2004). We conclude, however, that the prosecutor did not engage in misconduct.

The record contains the following procedural history, which informs our analysis. On January 23, 2003, and November 22, 2004, the defendant filed motions for disclosure of criminal offenses and uncharged misconduct.[6] On February 28, 2005, the state filed a notice of intent to offer uncharged misconduct evidence. That notice included the defendant's having broken the victim's arm and having abused her physically on or about November 13, 1997, which was claimed to be part of an ongoing pattern of the defendant's having sexually and physically abused the victim between the spring of 1997 and October, 1999.[7] On March 16, 2005, the

---

[6] The court granted the motions pursuant to *State v. Acquin*, 34 Conn. Sup. 152, 381 A.2d 239 (1977).

[7] The November 13, 1997 incident concerning the victim's broken arm originally had been in the first count of the information alleged against the defendant but was withdrawn because the arrest warrant for the defendant

defendant filed a motion objecting to the introduction of the misconduct evidence, claiming that it was more prejudicial than probative. On March 22, 2005, the state filed a supplemental notice concerning uncharged misconduct evidence that stated, in part, that "[t]he defendant began to use a wooden paddle to beat the victim, and her sister, after the family moved to [a new residence]." The court held a hearing on the admissibility of the uncharged misconduct evidence on March 30, 2005.[8]

When the court commenced the hearing, it referred to the state's offer of proof made "yesterday" and stated that it viewed the uncharged misconduct evidence as falling into three categories: evidence of the defendant's (1) having beaten the victim with a *paddle* and breaking her arm, (2) having had sexual contact with the victim within the time frame of the information and at times other than that which is alleged and (3) having ordered the victim's sister to convey certain information about the crimes charged and the sister's observations that are relevant to the crimes charged, and having beaten the sister *in a fashion similar* to his having beaten the victim.

The defendant objected to the admission of the uncharged misconduct, with the exception of his allegedly having broken the victim's arm, because the state's notice did not provide sufficient detail, in violation of *State* v. *Acquin,* 34 Conn. Sup. 152, 153, 381 A.2d 239 (1977).[9] Defense counsel also stated that the prosecutor

---

was signed twenty days beyond the statute of limitations for nonsexual crimes. See General Statutes §§ 54-193 and 54-193a.

[8] We were unable to find the subject offer of proof in the transcripts provided; there is no transcript of the March 29, 2005 proceedings.

[9] "[W]here the state seeks to prove that an accused has been guilty of additional crimes and misconduct on other occasions, although such evidence is otherwise admissible under some exception to the general exclusionary rule, it shall not be received unless within ten days before trial the state furnishes the defendant with a written statement of the offenses it intends to show he committed, described with regard to their nature, date and place of occurrence. This shall not apply to the following: (1) offenses which are a part of the immediate episode, (2) offenses for which the

"intends to offer evidence through the younger sister of the victim that she, too, is beaten by the defendant with a *wooden board or paddle*. I don't even know when. . . . [M]y impression is that he's going to say 100 times." (Emphasis added.) Defense counsel also argued that there was no nexus between the uncharged misconduct evidence contained in the state's notice and the crimes alleged to demonstrate that the uncharged misconduct was part of a common scheme. The court summarized its understanding of defense counsel's argument as the state's having failed to meet the specificity requirement of *Acquin* or the legal exceptions necessary to demonstrate the admissibility of the misconduct evidence.[10] The court ruled that the misconduct evidence concerning the defendant's having physically and sexually abused the victim was admissible, but that evidence of his having physically abused the victim's sister was overly prejudicial and could not to be introduced during the state's case-in-chief.

After further discussion with the prosecutor about the nonspecific claims of sexual contact between the defendant and the victim, the court asked defense counsel if there were other legal objections he had to the uncharged misconduct with respect to the sister. Defense counsel responded that he had no objection to the sister's testifying about her observations that

defendant has been previously prosecuted, and (3) offenses offered to rebut the defendant's evidence of good character." *State* v. *Acquin,* supra, 34 Conn. Sup. 153–54.

[10] Defense counsel responded in part to the court's summary: "[O]ther than the broken arm situation, what we're talking about in his memorandum as to other—it talks about the *paddle,* but it says, the *paddling* of numerous times. So, I'm not quite sure what we're talking about." (Emphasis added.)

Defense counsel also acknowledged that the discovery provided by the state mentioned "an incident of *paddling*; but then he's got in here where even the sister is going to talk about being *paddled.* I see nothing in her statement where she's saying she's being *paddled.* . . . I still don't think the *paddling* of the younger sister is a premise that really has a nexus to show common scheme." (Emphasis added.)

corroborate the victim's testimony. He objected to the sister's testifying about the defendant's misconduct toward her and noted a statement in which the sister stated that the defendant had *paddled* her with a board. The prosecutor responded that *paddling* was evidence of the defendant's disregard for the welfare of the victim by sexually and physically abusing her and that the defendant had an intent to injure and to hold everyone in fear.

The court ended that portion of the hearing, stating that "with respect to [the sister], evidence contained in the state's offer of proof that she was told to lie by the defendant about her observations or her direct observations of abuse that was done against her sister that is the subject matter of the information, that's all clearly admissible on independent grounds either as an admission of the defendant or her own eyewitness observations. With respect to the allegations of beatings as to her . . . that evidence may have some relevancy to a common scheme with respect to the family or an intent to abuse the family. There may be some relevance there, but as to that aspect of her testimony, I find that it is overly prejudicial . . . ."

The defendant's claim pertains to the following direct examination by the prosecutor of the victim's sister:[11]

"Q. Do you recall being told by anyone to tell anyone who asked a particular story about how the [victim's] arm had been injured?

"A. Yes.

"Q. And who asked you to say what?

"A. [The defendant] told us to tell my mom that me and [the victim] were playing on the bed and jumping

[11] The victim has three younger sisters. The sister referred to in this opinion is the sister next in age to the victim.

around and swinging around, and that I had let her go and she fell off and landed on her arm.

"Q. And what was his manner when suggesting that you ought to say that?

"A. He seemed angry, like, if I didn't say it, I figured since he had threatened us many times before, if I didn't say it, that I would get in trouble.

"Q. And when you got in trouble, in general, what happened to you?

"A. I got beatings.

"Q. By him?

"A. Yes."

The defendant did not object to the question or ask that the answer be stricken from the record and the jury instructed to disregard it. Our review of the transcript does not reveal that the court at any time admonished the prosecutor outside the presence of the jury for having violated its order.

The state argues that the question did not violate the court's order because the order specifically pertained to evidence that the defendant had beaten the victim's sister with a *paddle* as he had beaten the victim and that the testimony elicited from the victim's sister did not concern beatings with a *paddle*. After reviewing the state's supplemental notice of uncharged misconduct evidence and the entire transcript of the hearing on uncharged misconduct evidence, we conclude that the state's position is not simply hairsplitting. During the hearing on the admissibility of the uncharged misconduct evidence, the word *paddling* was used repeatedly by both the defendant and the prosecutor, and the discussion of *paddling* specifically was differentiated from the discussion of physical violence generally.

Here, the prosecutor asked one question that could have elicited a response that would have violated the court's order pertaining to the defendant's having beaten the victim's sister with a *paddle*. There was no objection, and the court failed to intervene. The prosecutor did not, however, invoke the word *paddle* in his question. Although the prosecutor may have gone to the edge of the court's order, we cannot say on the basis of the record before us that he deliberately violated the ruling or that he intended to undermine the authority of the court. The facts of this case are similar to those in *State* v. *Sherman*, supra, 38 Conn. App. 371.

## B

Next, the defendant claims that the prosecutor committed misconduct by eliciting testimony from one of the state's expert witnesses as to (1) the ultimate question of whether the defendant had penile intercourse with the victim and (2) whether the victim's complaint was credible. We do not agree that misconduct occurred.

## 1

During its case-in-chief, the state called Judith Moskal-Kanz, a pediatric nurse practitioner and forensic medical examiner for child sexual abuse and child abuse, as a witness. Moskal-Kanz testified, in part, on direct examination by the prosecutor that scarring on the victim's hymen was consistent with penile penetration and consistent with the victim's description of the intercourse the defendant had forced on her.[12] On cross-examination, defense counsel asked Moskal-Kanz,

---

[12] On direct examination, Moskal-Kanz testified as follows in response to questions from the *prosecutor*:

"Q. Is the scar on [the victim's] hymen consistent with being caused by the penetration of her genital area by a male penis?

"A. It is consistent with that, yes.

"Q. And is it consistent with the description of the sexual intercourse that [the victim] gave to you in the medical interview that you did with her?

"A. It is consistent with that, yes."

among other things, a series of questions concerning her opinion and whether the furrow in the victim's hymen could have been the result of something other than penile penetration, including hypothetical events not in evidence.[13]

---

[13] *Defense counsel* questioned Moskal-Kanz as follows on cross-examination:

"Q. You got information either from the child or her foster mother that she had been a victim of sexual abuse; am I correct?

"A. I got information from [the victim], yes.

"Q. And with that information and the injury, you came to a conclusion that you testified on direct; am I correct?

"A. I don't believe that I testified to a definitive conclusion that had to do with that.

"Q. So, you don't have a definitive conclusion concerning that?

"A. Concerning the injury?

"Q. Concerning the injury.

"A. I have an opinion of the injury.

"Q. You have an opinion, but no conclusion? . . . What I'm asking you is, the injury on the vagina as it is now, if you didn't know that there was sexual abuse, that injury could occur from many other things; am I correct?

"A. Not many other things, no.

\* \* \*

"Q. In your opinion, [if] you were not given the information that a sexual abuse occurred, could this injury have been caused by anything else, and I think you've answered that yes, correct?

"A. It can be caused by some limited scenarios.

"Q. It would have to be an object?

"A. Well, no. Do you consider a penis an object?

"Q. Yes, that's an object.

"A. Okay, yes, it would be an object.

"Q. And a penis is the only object that could cause that injury?

"A. No. I just didn't know if you wanted me to differentiate between the two.

"Q. It can be caused by an object. Can you indicate what type of objects can cause that?

"A. You would have to have an object that would be of the right size to cause a penetration without causing other external injuries because there aren't any other injuries. It would have to be able to tear the hymen.

\* \* \*

"Q: The information that you're basing a lot of your opinions on is the fact that [the victim] told you that she had been sexually abused; is that correct?

"A. No, that's incorrect. . . .

"Q. Were you told by [the victim] that she was sexually abused?

"A. I was given specific details of sexual contact by [the victim], yes.

On redirect examination, the *prosecutor* asked Moskal-Kanz the following questions, which, on appeal, the defendant claims were improper because they called for an answer to the ultimate question in the case:

"Q. Now, you were asked [on cross-examination] repeatedly to leave out of your opinion the history that was taken by you of [the victim].

"A. Yes.

"Q. Do recall that series of questions? I want you to put it in. Everything that [the victim] told you about the sexual abuse that's reflected in your report, add that into what you observed of the injury to the hymen. Do you have an opinion based upon all of that as to whether that injury was caused by sexual penetration of her by [the defendant's] penis?

"A. My entire opinion?

"Q. Your entire opinion.

"A. My entire opinion is that the insertion of a penis into a vagina is a purposeful act which would not result in any other extenuating injuries that an accidental insertion of an object would cause, so that the injury is most likely, especially coupled with that history, to be the result of the penile penetration that [the victim] described since there are no extenuating injuries that would be consistent with an accidental injury."[14]

* * *

"Q. So, how did you conclude that the hymen was scarred by what you indicate, a penis?

"A. Again, no one has asked me if a penis caused that laceration.

"Q. Did a penis cause that laceration?

"A. I cannot tell you. I can tell you there is a laceration that is consistent with penile penetration.

"Q. But you don't know whether a penis caused that?

"A. I would have to have been with the child at the time of the injury to tell you the exact mode of injury. I can only go by the reasonable history given."

[14] The *prosecutor* immediately followed up with the following question to Moskal-Kanz:

"Q. And when you say extenuating circumstances, what do you mean?

Because we conclude that the questions posed by the prosecutor clarified the testimony given on cross-examination, we conclude that the challenged questions were not improper. During cross-examination, defense counsel sought to elicit testimony from Moskal-Kanz that the furrow in the victim's hymen possibly could have resulted from some type of injury other than penile penetration. On redirect examination, the prosecutor sought to focus Moskal-Kanz' testimony on the evidence before the jury, not on possibilities. He asked the witness whether the victim's injury was consistent with the medical history she obtained from the victim, which included facts that the defendant had forced his penis into the victim's vagina and Moskal-Kanz' medical examination of the victim. The question was proper, as it focused the jury's attention on the facts in evidence and the very purpose of Moskal-Kanz' having examined the victim for evidence of sexual abuse.

"The basic purpose of redirect examination is to enable a witness to explain and clarify relevant matters in his testimony which have been weakened or obscured by his cross-examination. . . . The scope of redirect examination, however, is limited by the subject matter of cross-examination." (Internal quotation marks omitted.) *State* v. *Sanchez*, 58 Conn. App. 382, 386, 754 A.2d 192 (2000). "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party

---

"A. Several things. One, in order to cause a laceration on a hymen, especially a significant laceration on a hymen that actually goes beyond the hymen into the vaginal vault, you have to have a significant trauma of some significant force with the trauma that would then result in an injury that would cause a child and a parent to seek medical care, number one. Number two, if you have an accidental trauma such as where you're looking at something that caused a laceration in order to get just a laceration and no other injuries, the object would have to be carefully placed into the vagina. It couldn't hit or tear or cause other injuries on the rest of the vagina, and for an accident to occur with such precision is nearly impossible."

who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may . . . allow it . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Raynor*, 84 Conn. App. 749, 766, 854 A.2d 1133, cert. denied, 271 Conn. 935, 861 A.2d 511 (2004). Except for the use of the defendant's name, the prosecutor's question on redirect examination substantively was no different from the question he asked on direct examination.[15] Moskal-Kanz' testimony on redirect examination substantively was consistent with her original testimony, that is, that the furrow in the victim's hymen was consistent with penile penetration. See footnote 12 of this opinion.

2

We now focus on the defendant's claim that the prosecutor improperly questioned Moskal-Kanz about the victim's credibility. We are unpersuaded by the defendant's claim.

On cross-examination, *defense counsel* queried Moskal-Kanz about the veracity of allegations of sexual abuse made by children:

"Q. And there are individuals in your field that believe when a child makes an allegation of sexual abuse it has to be true; am I correct?

"A. I think you're not correct.

"Q. Well, let me ask you this. Do you believe when a child makes an allegation of sexual abuse, it has to be true?

---

[15] The defendant takes particular exception to the prosecutor's having used his name when asking the question. Although it would have been better to avoid using the defendant's name, we cannot say that the question resulted in harm to the defendant, as the jury knew that he was the person accused of sexual assault in the first degree.

"A. That's not true.

"Q. So, children can make up allegations of sexual abuse; am I correct?

"A. It's very rare, but it certainly could happen.

"Q. Okay. It's very rare. How do you find out—there [are] ways of finding out whether a child is making a false allegation; am I correct?"

Defense counsel then asked Moskal-Kanz about the influence family dynamics have on a child's allegations of sexual abuse.

On redirect examination, the *prosecutor* asked Moskal-Kanz the following questions to which the defendant now objects, although he did not object at trial:

"Q. Have you interviewed children who you felt were not being completely truthful about their allegations?

"A. I have had cases where children have not been truthful about the allegations.

"Q. And in those cases have you had the kind of detail that you were provided by [the victim]?

"A. No, absolutely not.

"Q. How did it compare?

"A. It can go in either direction. Most common direction is that the details are exceptionally vague because there aren't the details in existence to remember. It can also go in the opposite extreme where a child can try to provide you with perfect detail and thereby there [are] clear conflicts.

"Q. Conflicts in the details?

"A. Yes.

"Q. Did you see any such conflicts in the details given to you by [the victim]?

"A. No.

"Q. Or any such exaggeration that cause you to have any concern about whether this was true or not?

"A. No."

The prosecutor's redirect-examination concluded with this question and answer. On recross-examination, defense counsel immediately questioned Moskal-Kanz about false allegations of sexual abuse and what factors influence a child's ability to be truthful about sexual abuse. Defense counsel also posed a series of questions to Moskal-Kanz about the victim's having a reason to lie, such as wanting to remain with her foster mother rather than returning to her mother's home where she took care of her younger sisters, and whether she had a history of being untruthful.

"Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"The determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claim. . . . An expert witness ordinarily may not express an opinion on an ultimate fact, which must be decided by the trier of fact. . . . Experts can [however,] sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings,

needs expert assistance on the precise question on which it must pass. . . .

"Additionally, in cases that involve allegations of sexual abuse of children, we have held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify as to his opinion or whether a victim in a particular case is credible or whether a particular victim's claims are truthful. . . . In this regard, we have found expert testimony stating that a victim's behavior was generally *consistent with* that of a victim of sexual or physical abuse to be admissible, and have distinguished such statements from expert testimony providing an opinion as to whether a particular victim had *in fact* suffered sexual abuse." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634–35, 881 A.2d 1005 (2005) (trial court abused discretion by admitting expert's unredacted written report containing diagnosis of child sexual abuse and similar direct testimony).

On cross-examination of Moskal-Kanz, defense counsel sought to impeach the victim's credibility. The redirect examination that the defendant challenges elicited testimony as to the typical behavior of a child victim of sexual abuse and the manner in which a forensic expert can determine whether a child is being truthful. Moskal-Kanz testified that there were no conflicts or exaggeration in the victim's recounting the sexual abuse she endured. The prosecutor asked Moskal-Kanz to compare the nature of the victim's allegations to the common behaviors of children who claim to have been abused sexually, and whether she had any concerns about conflicting and exaggerated details that would

lead her to question the truthfulness of the allegations. In our assessment, the prosecutor's question on redirect examination falls within the permissible ambit of *Iban C.*

We again note that the defendant failed to object to the prosecutor's question. In his reply brief, the defendant attempts to deflect the state's argument that because defense counsel did not object, he could not have considered the questions improper. In doing so, the defendant relies on *State* v. *Williams*, supra, 204 Conn. 523, for the proposition that "in a case of serious and repeated prosecutorial misconduct . . . the trial court has an independent responsibility to intervene, even in the absence of an objection or motion by defense counsel." Id., 549. Rather than supporting his claim that the prosecutor's question constituted misconduct, the law cited, under the facts of this case, supports the state's argument that no misconduct occurred because the court did not intervene to strike the testimony from the record or to admonish the prosecutor. The defendant cannot sit quietly and withhold an objection at trial and change his strategy on appeal to claim that reversal is required because his trial strategy failed. See *State* v. *Duncan*, 96 Conn. App. 533, 560, 901 A.2d 687, cert. denied, 280 Conn. 912, 908 A.2d 540 (2006).

Furthermore, the transcript discloses that on recross-examination, defense counsel questioned Moskal-Kanz at length in an effort to discredit the victim, to imply that the victim had an ulterior motive to allege sexual abuse by the defendant and that Moskal-Kanz had failed to conduct an investigation to determine whether the victim had a reputation for or history of lying. Defense counsel had a full opportunity to vet Moskal-Kanz' assessment of the victim's allegations of sexual abuse and her history for veracity.

## C

The defendant also claims that the prosecutor's final argument constituted misconduct because it appealed to the passions of the jurors, vouched for the victim's credibility and made reference to facts not in evidence. We do not agree that the prosecutor's closing argument constituted misconduct.

### 1

The defendant first claims that the prosecutor's closing argument improperly appealed to the passions of the jury. We disagree.

#### a

The transcript reveals that before final argument, the court instructed the jury, in part: "And the statements of the lawyers, while I presume they will be helpful to the jury, and I ask you to listen to them carefully, [they are] not evidence. You've already heard the evidence, and you should not consider it as evidence. And if what they say about the evidence differs from your recollection of the evidence, it's your recollection of the evidence that controls." After greeting and thanking the jury, the prosecutor implored the jury to visualize the victim as she was at the time the abuse occurred and not as the person who testified before them.

The prosecutor commenced his argument by stating: "I want you to close your eyes, at least figuratively, and I want you to see [the victim], but I'm not talking about the [victim] who was sitting here at age fifteen in front of you a brave poised young woman, who testified in this court last Thursday. I want you to picture the skinny little girl that she was at seven and eight. At six, she weighed fifty-five pounds. When she was eleven, she weighted ninety-five pounds. She was under four feet tall when she was six and only four foot, eight [inches tall] when she was eleven. A shy, quiet, tired girl as

[her school principal] told you. A child still learning in school through play. That's the child who this defendant beat up constantly. That's the child whose arm this defendant broke, whose teeth he chipped, who he punched in the face for nothing or for her sisters' misdeeds or because she didn't clean up the way he wanted her to. That's the child who the defendant [woke] up in the middle of the night and forced to do, in her words, nasty things to his thing. That's the child who the defendant touched on her undeveloped chest, on her vagina, on her legs. And that's the child, who at age nine, this defendant forced to have intercourse with him on his special bed. That's the child in these pictures. A second thing I want you to do is to think about the year 1997. That's eight years ago. For [the victim], that's half her lifetime. While you consider the evidence in this case and the testimony that you heard, keep that in mind."[16]

The defendant has argued that the prosecutor's words were an appeal to the passions of the jurors because they portrayed the victim as being brave in coming before them to testify and small, weak and helpless at the time of the defendant's abuse. The defendant claims

---

[16] Next, the prosecutor argued: "Now, during summations, and the judge has mentioned this at some level and will do so again, the lawyers are going to talk to you about facts, and we're going to talk to you about the law. Now, you already know that we aren't the fact finders here, you are. The facts in this case are based upon the evidence on that table and the evidence you got from witnesses. And if we say something that isn't what you think the facts are, you are the people who are right, and we're wrong. The lawyers don't have any secret information here because the only information is the exact information that you have. So, you shouldn't think that if we say something that you find to be inaccurate that that's because we have some secret knowledge that you don't have. It's you that gets to make that determination, but we can't make the argument unless we say, you know, I submit to you the facts are this and that's a phrase that we generally use, I submit to you that you will find that these facts exist. Okay. I'm going to leave out a big chunk of that, 'the I submit to you that you will find' part. Just put that in front of every sentence so that we can finish this a little quicker."

that such language encouraged the jurors to sympathize with the victim, to feel disgust toward him and, because she was a child, to find her credible.

"[A] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based on facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 394, 832 A.2d 14 (2003).

The defendant would have us rely on *Ceballos* to conclude that this portion of the prosecutor's initial closing argument constituted misconduct because it made the victim appear to be brave in the eyes of the jury. The prosecutor's argument in *Ceballos* is distinguishable. In that case, the prosecutor used the word *courage* twice with respect to the victim's coming into court to testify against the defendant, which our Supreme Court concluded was an inappropriate appeal to the jurors' emotions. Id., 396.

In the case before us, the prosecutor painted a verbal picture of the victim at the time of the alleged crimes to point out to the jurors that the victim they saw at trial was physically different eight years ago. The prosecutor also recounted the evidence of abuse the victim had suffered because of the defendant. Indeed, in *Ceballos*, our Supreme Court found that the prosecutor's graphic portrayal of that victim's unfortunate family circumstances was not misconduct; even though it painted the victim in a sympathetic light, it focused on the defendant's opportunity to abuse. The defendant here also objects to the prosecutor's having used the word

child seven times because it created a feeling of disgust in members of the jury. The answer to that is that the victim was a child between the ages of eight and ten when the defendant abused her physically and sexually.

Although the prosecutor's opening remarks in this case were predicated on evidence presented at trial, it would have been better had the prosecutor made his qualifying remarks; see footnote 16 of this opinion; before, rather than after, painting a picture of the victim at the time the defendant had abused her. See also *State v. Santiago*, supra, 269 Conn. 751 ("state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like" [internal quotation marks omitted]). Nevertheless, we do not conclude that his failure to do so was misconduct.

b

The defendant also claims that the prosecutor made an improper reference to the terrorist attacks of September 11, 2001, because the event was irrelevant to the facts in this case. The prosecutor argued, "[w]hen you think about, 'do I remember the statement that I gave'; I would guess that everybody here remembers where they were when they first heard that a plane had crashed into the Twin Towers in New York, but do you remember the details of the first conversations you had with somebody about that?"

"[B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the

heat of argument. . . . Nevertheless, [w]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Necaise*, 97 Conn. App. 214, 229–30, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

Although we acknowledge that reference to September 11, 2001, generally evokes an emotional response, the prosecutor invoked a rhetorical device to highlight the failings of human memory generally.[17] To impeach her credibility, the defendant cross-examined the victim at length to point out inconsistencies between her testimony and what she told investigators. We cannot say that the prosecutor's use of a rhetorical device distracted the jury from its task of evaluating the victim's credibility.

2

The defendant also claims that the prosecutor vouched for the victim's credibility. We do not agree.

The defendant cites the following portions of the prosecutor's argument to support his claim. "During jury selection, each of you agreed with the obvious statement that crimes are often committed in secret where there aren't a lot of witnesses, but wouldn't you expect that to be even more true of child abuse cases? In this case, only . . . the victim can give you all the details of what this defendant did to her."[18] The defendant argues that the statement by the prosecutor is

---

[17] It is not uncommon for individuals to discuss where they were when a tragic event in our collective memory occurred, whether it be the sinking of the Titanic, the bombing of Pearl Harbor, the assassination of John F. Kennedy, the Challenger explosion or September 11, 2001.

[18] In order to consider the defendant's claims related to the prosecutor's argument, we review the language the defendant claims is improper in the context in which it was used. See *State* v. *Warholic*, 278 Conn. 354, 364–65 nn.4–5, 897 A.2d 569 (2006); *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993) (review comments complained of in context of entire trial).

"During jury selection, each of you agreed with the obvious statement that crimes are often committed in secret where there aren't a lot of witnesses, but wouldn't you expect that to be even more true of child abuse cases? In this case, only . . . the victim can give you all the details of what this defendant did to her. And for some of the charges, [the victim's] testimony is the only testimony that you have directly telling what happened there, but that testimony, if you believe it, as I submit you will, some of you already do, is sufficient to prove each of those charges.

"And as you also know, that's not the only evidence in this case, but [the victim] was here in court and, for the moment, take the other evidence out of the case. If you believed [the victim's] testimony in this case and if you find as I submit that you will that there is no contradictory evidence raising a reasonable doubt about what she told you, then her testimony is sufficient, if you believe her, to convict in every single one of these crimes. And to a large extent, it's the credibility of [the victim] that is the basis of this case, all and not exclusive.

"You saw her testify. You heard her testify. Did she know what happened to her? Did she present it in a way that sounded reasonable, that sounded believable, that sounded as if she was recounting the mental picture of her ordeal to you as much as eight years after it happened? . . . Did the sequence of the abuse make sense in the way that the world lives? Those are the kinds of things that you use to determine credibility every single day. More important, was there anything in the case that you heard, in the evidence that's in this case that raises any reasonable doubt about the truthfulness of [the victim's] testimony? I submit to you that you won't find any such evidence.

"One of the things to look at when you talk about her testimony is what did the cross-examination actually ask her to do? The cross-examination repeatedly asked her, 'do you remember saying this to Detective Hunter? or, 'do you remember saying this to Sharon Kelley [a forensic psychologist at a children's clinic]?' and the answer, frequently, most of the time was, 'no, I don't remember saying that.' But as you know, questions are not evidence, and the fact that the phrase starts out, 'do you remember telling this person this thing,' doesn't make this thing be true unless there's independent evidence of it that it was said. That's part of the lawyers don't have any secret information. The question can be asked, but the question was, 'do you remember saying it?' And she said, 'I don't remember saying it.'

"She also told you that she remembers very clearly what he did to her, what that man did to her. She did tell you that although she doesn't remember the exact words that she used years ago, she did tell the truth to Hunter and Kelley, and you didn't hear anything to the contrary from either of them. When you think about, 'do I remember the statement that I gave'; I would guess that everybody here remembers where they were when they first heard that a plane had crashed into the Twin Towers in New York, but do you remember the details of the first few conversations you had with somebody about that? You remember the traumatic event, but not necessarily exactly what you said. For [the victim], she's describing to you incredibly traumatic events and telling you she doesn't remember exactly what she said about it, but she remembers the events and could tell you about them

tantamount to saying that because the victim came forward and bravely testified, she necessarily was truthful. The defendant also claims that the prosecutor repeated that theme when he argued, "[s]he did tell you, although she doesn't remember the exact words that she used years ago, she did tell the truth to Hunter and [Sharon] Kelley [a forensic psychologist at a children's clinic] and you didn't hear anything to the contrary from either of them."[19] The defendant argues that because Hunter and Kelley were highly qualified investigators of child sexual abuse, they obviously believed the victim's allegations against the defendant. Furthermore, because witnesses are not permitted to comment on the veracity of a witness' testimony, there was no evidence to support the prosecutor's argument.

"The parameters of the term zealous advocacy are . . . well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 363, 897 A.2d 569 (2006).

Our Supreme Court has held that "the state may argue that its witnesses testified credibly, if such an argument

here. There simply is no evidence in this case that you should not believe [the victim], and you heard her and you saw her."

[19] Hunter interviewed the victim and videotaped the victim's interview with Kelley, the forensic psychologist to whom the victim was referred by the department.

is based on reasonable inferences drawn from the evidence. . . . In addition, jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Citations omitted; internal quotation marks omitted.) Id., 365.

On the basis of our review of the record, we see merit in the state's argument that the prosecutor was addressing that portion of the defendant's cross-examination of the victim in which the defendant attempted to discredit her by asking about the specific language she had used during her interviews with Hunter and Kelley, which varied from her testimony at trial. The prosecutor noted that on redirect examination, the victim testified that she was unable to remember exactly what she said during the interviews but that she did tell Hunter and Kelley the truth, as best she could. On appeal, the state argues that the defendant was unable to impeach the victim's credibility during his cross-examination of Kelley and Hunter. Their testimony was not inconsistent with the victim's version of the defendant's abuse.

Although the prosecutor could have expressed himself with greater precision, we cannot say that his argument constituted misconduct. "[W]e are mindful . . . that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning

from the plethora of less damaging interpretations." (Internal quotation marks omitted.) Id., 368.

## 3

The defendant's final claim with respect to the prosecutor's closing argument is that he made reference to facts not in evidence. We disagree.

During his final argument, the prosecutor stated: "You know from the evidence there could possibly be more charges because of the repetitive nature of the defendant's behavior against [the victim], but they aren't there. And therefore, they're not something that you have to consider in terms of proof, nor do we have to prove them beyond a reasonable doubt." The prosecutor's argument was proper because the jury heard evidence of the defendant's having broken the victim's humerus, among other acts of violence against the victim, but that misconduct was not included in the information because the statute of limitations had expired on that crime. See footnote 7 of this opinion. The prosecutor merely was explaining to the jury that the state did not have to prove beyond a reasonable doubt possible crimes that were not alleged in the information. For this reason, the defendant's claim fails.

Because we do not agree that the prosecutor committed misconduct, there is no need to undertake a due process analysis pursuant to *State* v. *Williams*, supra, 204 Conn. 540, as, a fortiori, in the absence of misconduct no such due process violation has occurred, and the defendant was not deprived of a fair trial.

## II

The defendant also claims that the court improperly denied his motion and multiple requests to dismiss his second special public defender. The defendant's motion and requests to dismiss counsel were filed at different times and considered by different courts, *Damiani, J.,*

and *Devlin, J.*, and he does not distinguish the rulings of the courts on appeal. He claims, however, that both courts denied him the constitutional right to counsel because there was a conflict of interest between him and counsel, whom he did not trust, and thus he was forced to absent himself from the courtroom at critical stages of the proceedings, which resulted in prejudice to him.[20] We do not agree that either court abused its discretion in denying the defendant's motions and requests to dismiss counsel and that he was prejudiced by the courts' rulings.

The facts underlying the defendant's claim predate the trial. On March 17, 2004, the court, *Fasano, J.*, granted the defendant's motion to dismiss the special public defender who had been representing him in favor of private counsel.[21] The defendant filed another motion to dismiss his privately retained counsel on the basis of a breakdown of the attorney-client relationship.[22] Judge Damiani granted the motion on November 15, 2004. Because the defendant was without funds to retain new counsel, a second special public defender, Michael L. Moscowitz, was appointed to represent him.

[20] Although the defendant claims that he was denied a constitutional right to counsel, he has failed to state whether he relies on the state or federal constitution. Because the defendant relied on the federal constitution in his pro se motion to dismiss counsel, we will review the claim pursuant to the federal constitution.

[21] In his motion to dismiss his special public defender, the defendant stated: "I have been in jail for [fourteen] months. Donald Dakers is my attorney right now. I would like to please have Mr. Donald Dakers remove[d] from my case. I have ask[ed] Mr. Dakers to do so many things on my behalf. But he has not done anything to help me. This is my life this man is playing with."

Our review of the file discloses that Dakers, in 2003, filed a motion for a bill of particulars, a motion to reduce the defendant's bond and motions to suppress identification, evidence and statements, a motion to disclose uncharged misconduct and a motion to dismiss, in addition to a number of other motions on the defendant's behalf.

[22] In his motion to dismiss his privately retained counsel, the defendant stated: "Has not done anything I ask him to. Not only that, I don't like this man."

About six weeks later, the defendant filed a pro se motion to dismiss Moscowitz. On January 10, 2005, Judge Damiani considered the motion. The defendant represented to the court that Moscowitz had not visited him, did not return his telephone calls and lied to him, and that the two argued every time they talked by telephone. The defendant stated, "I'm getting ready to go to trial. I don't want nobody representing me like that."[23] Moscowitz denied the allegations that he was unresponsive to the defendant, informing the court that he had spoken to the defendant every time he called and that he visited the defendant in the courthouse for the length of time the defendant desired. Judge Damiani denied the motion, stating that the defendant had had three able lawyers and explained to the defendant that he cannot pick and choose, even though he may not be happy with the personality of the lawyers representing him.

Following the court's ruling, Moscowitz represented to the court that he was perplexed and "not quite sure where [the defendant] comes up with that he's not properly represented. He has been properly and effectively represented." He requested that the court order a competency evaluation of the defendant, pursuant to General Statutes § 54-56d. Judge Damiani ordered a competency evaluation of the defendant.

Subsequent to the receipt of the competency report and on the basis of the report, the parties, at a hearing on February 8, 2005, stipulated that the defendant was competent to stand trial. The defendant had written to the court, claiming that Moscowitz had failed to be fair

[23] Moscowitz filed a motion for a speedy trial on January 5, 2005. In November, 2004, Moscowitz filed the following motions and pleadings on behalf of the defendant: motion for discovery and production, motion for a bill of particulars, motion in limine, motion to suppress, motion to suppress identification, motion for notice of uncharged misconduct and motion to suppress evidence.

and to perform basic obligations. Despite the second request that he be dismissed, Moscowitz told Judge Damiani that he could represent the defendant. The court denied the motion to dismiss and ordered jury selection to begin the following week.[24]

Jury selection proceeded without incident for several days, but the defendant again sought to discharge Moscowitz by submitting a letter to Judge Devlin on March 3, 2005, claiming that Moscowitz had failed to give him certain of the victim's medical records. Moscowitz represented to Judge Devlin that he had copied everything that he had received from the state and turned it over to the defendant. The defendant further complained that he did not like Moscowitz' attitude or the way he spoke to him.[25] Judge Devlin told the defendant that he regretted the defendant's disappointment but that he saw no basis to discharge counsel. The defendant threw a tantrum, stated that Moscowitz was not going to represent him and asked to be taken from the courtroom. The court advised the defendant that it was not in his interest to be absent from the courtroom and later recessed court for the day.

On March 4, 2005, the defendant apologized to Judge Devlin and told him that he wanted to retain private

---

[24] In asking that his private counsel be dismissed, the defendant claimed that private counsel had failed to file a motion for a speedy trial as the defendant had requested. Moscowitz filed a speedy trial motion on the defendant's behalf.

[25] The defendant represented to the court that "[m]y life is at stake here. You know, I do not like this man. Okay. He's not going to represent me. There's more to this than what you see. He get up here and talk that BS in front of you because he has to project an image for you all, but when he get with me, this man don't give me the time of day. And I'm facing too much time to be with a lawyer [like] this. And this is the second time I'm asking the court to remove him. I don't want to get like this, but I keep telling the court this man he's playing two personalities. One with you and one with me. I'm not going to keep putting up with this because I'm not going to let him provoke me to do something I'm going to regret later. I got to stay away from him. Please take me out of here."

counsel but had not yet secured such representation. The defendant elected to leave the courtroom, despite additional warnings from the court that it was not in his interest to do so. Jury selection continued, however, in the defendant's absence.

The presentation of the state's evidence began on March 31, 2005. Midway through the next day, the defendant told Judge Devlin that Moscowitz was not showing him the proper respect. The defendant also complained that Moscowitz would not put on the evidence he wanted presented. The court explained to the defendant that counsel was in the better position to make decisions about the presentation of the defense. Again, the defendant wanted to leave the courtroom, but the court persuaded him to stay. After the jury had been excused for the day, the defendant asked the court again to replace Moscowitz and to grant him a sixty day continuance to find another lawyer. The defendant complained that there had been a breakdown in communication between him and Moscowitz, that there was no trust and that he was uncomfortable under the circumstances. Moscowitz told the court that he had met with the defendant in the lockup, often asked for a short recess to consult with the defendant and frequently consulted with the defendant during cross-examination.

The defendant also complained to the court that he had been unable to telephone his brother, who had his money, to request that he hire counsel to represent him. The court instructed the marshals to let the defendant make a telephone call to his brother before the defendant left the courthouse that day.

On April 5, 2005, the defendant agreed that Moscowitz could continue to represent him that day and was present for all of the proceedings. After the state rested its case, the defendant consulted with Moscowitz and elected not to testify in his defense. Moscowitz then

informed the court that he and the defendant were having a dispute over the presentation of character witnesses. The defendant did not agree with Moscowitz' decision not to call any character witnesses. The court granted a recess for Moscowitz to consult with the defendant. Thereafter, defense counsel asked the court for permission to make an offer of proof by the defendant's son, Daryl Dixon, so that the court could determine the scope of cross-examination. Dixon testified that he personally did not know the defendant to be abusive sexually or physically. After Dixon testified outside the presence of the jury, the court ruled that the state could cross-examine him about specific acts of uncharged misconduct related to the defendant's character for sexual and physical abuse. The defendant then decided not to have Dixon testify before the jury. The defendant presented the testimony of one witness and rested.[26]

The next day, just after the jury had entered the jury box to receive the court's instructions, the defendant stood up and approached the rail of the jury box and exclaimed that he had not been permitted to put on his evidence and that he had not been permitted to retain private counsel. Judge Devlin immediately excused the jury and found the defendant to be in contempt. The defendant responded by excoriating the court that he had not been treated fairly and that his rights had been violated.[27] The defendant stated that he had evidence to prove his innocence that he had given to Moscowitz

---

[26] Mark Hommel, a board certified pediatric emergency room physician, was the attending physician at Yale-New Haven Hospital at the time the victim was treated for a broken humerus. On the basis of the X ray of the victim's humerus that depicted a spiral fracture, Hommel did not suspect physical abuse, as both the victim and her mother indicated that the victim sustained her injury when she fell off a bed. Hommel stated that the nature of the injury was consistent with what the victim and her mother had stated.

[27] The defendant stated in part to the court: "Don't sit up there and try to act like you did anything fair on my behalf."

but that Moscowitz had returned it to him. The court informed the defendant that he had to be quiet unless he wanted to be removed from the courtroom. The court asked the defendant to assure it that he would conduct himself properly. The defendant told the court that he would not assure it of anything. The court then instructed the marshals to escort the defendant from the courtroom. After the defendant was removed, the court recalled the jury and instructed the jurors to disregard the defendant's outburst and that it was not evidence. The court also explained that the defendant would not be present during the charge and that the jury was not to hold that fact against him. See Practice Book § 42-47.

While the jury was deliberating, the court recalled the defendant and asked him if he wanted to be present in court. Again, the defendant verbally attacked Moscowitz and the manner in which he had represented him. The defendant claimed that there was a conflict of interest and that Moscowitz would not present the evidence requested by the defendant or call witnesses on his behalf. The defendant then walked out of the courtroom. Later, the defendant reappeared and apologized to the court for his outbursts. The court vacated its finding of contempt. During the return of the jury's verdict, the defendant arose from counsel table, walked from the courtroom and into a holding area.

"The United States Supreme Court has definitively held that due process requires that the accused have the assistance of counsel for his defense. . . . The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 70 Conn. App. 515, 522, 800 A.2d 1200, cert. denied, 261 Conn. 927, 806 A.2d 1062 (2002).

"The standard when reviewing a denial of a request for alternate counsel . . . is whether the trial court

abused its discretion in determining that a factual basis did not exist for granting the request. . . . Practice Book § 3-10 requires that a court find good cause to grant a motion to withdraw. Our Supreme Court has held that to work a delay by a last minute discharge of counsel there must exist exceptional circumstances. . . . We must distinguish between a substantial and timely request for new counsel pursued in good faith, and one made for insufficient cause on the eve or in the middle of trial. . . .

"While a criminal defendant's right to be represented by counsel implies a degree of freedom to be represented by counsel of [the] defendant's choice . . . this guarantee does not grant a defendant an unlimited opportunity to obtain alternate counsel on the eve of trial. . . . Although the court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel . . . the extent of such inquiry lies within the court's sound exercise of discretion. After it has given the defendant an adequate opportunity to inform it of his or her complaints, the court has broad discretion in determining whether circumstances warrant the appointment of new counsel or the dismissal of the defendant's existing counsel." (Citations omitted; internal quotation marks omitted.) Id., 522–23.

"In evaluating whether the trial court abused its discretion in denying [the] defendant's motion for substitution of counsel, [an appellate court] should consider the following factors: [t]he timeliness of the motion; adequacy of the court's inquiry into the defendant's complaint; and whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." *United States* v. *Gallop*, 838 F.2d 105, 108 (4th Cir.), cert. denied, 487 U.S. 1211, 108 S. Ct. 2858, 101 L. Ed. 2d 895 (1988). On the basis of our review of the transcript and the file,

we conclude that whatever conflict existed between the defendant and Moscowitz was not so great that it resulted in a total lack of communication and prevented an adequate defense. Given the fact that Moscowitz filed a motion in limine to preclude the state from presenting evidence of the defendant's incarceration, counsel appeared well advised to omit testimony as to the defendant's character.

On the basis of our review of the record, we cannot conclude that either Judge Damiani or Judge Devlin abused his discretion in denying the defendant's motions or requests for new counsel. Within the space of approximately nine months, the defendant had been represented by three different counsel, one of his own choosing. Moscowitz was appointed to represent the defendant in November, 2004, and not six weeks later the defendant asked for new counsel. At a hearing before Judge Damiani, the defendant claimed, basically, that Moscowitz was unresponsive to him. Moscowitz represented facts to the contrary. The defendant's claim that Moscowitz did not return his telephone calls is belied by his representation that he and Moscowitz argued every time they spoke on the telephone. Judge Damiani properly informed the defendant that he was entitled to representation by counsel, but not the counsel of his choice. See *United States* v. *Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990) ("[R]ight to counsel of *choice*, unlike the *right* to counsel . . . is not absolute. An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." [Emphasis in original.]); see also *State* v. *Vega*, 259 Conn. 374, 391, 788 A.2d 1221 (disagreement with attorney's strategic and tactical decisions not good cause), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); *State* v. *Smith*, 73 Conn. App. 809, 819, 809 A.2d 1146 (2002) (defendant merely disapproved of

counsel's trial tactics), rev'd in part on other grounds, 273 Conn. 204, 869 A.2d 171 (2005).

In his brief, the defendant implies that Judge Damiani should have made further inquiry beyond his motions to dismiss counsel. The nature of the defendant's motions to dismiss Moscowitz were in the form of letters to the court in which the defendant made known the extent and degree of his unhappiness with counsel. At one time, the court asked the defendant if there were more he wanted to say, and the defendant merely responded that he would stand by what he previously had represented. The court's inquiry therefore was not inadequate. Judge Damiani indeed appeared to comprehend the nature of the defendant's dissatisfaction.

The case law makes clear that a motion to dismiss counsel is not to be granted on the eve of trial without the demonstration of exceptional circumstances. "A request for substitution of counsel requires support by a substantial reason, and may not be used to achieve delay." *State* v. *Drakeford*, 202 Conn. 75, 83, 519 A.2d 1194 (1987). In this case, one of the reasons the defendant sought to discharge his private counsel was private counsel's failure to file a motion for a speedy trial, as the defendant wanted. See Practice Book § 43-39 et seq. Moscowitz filed a motion for a speedy trial along with numerous other motions on the defendant's behalf.[28] At the time the defendant first asked that Moscowitz be dismissed, the speedy trial motion was pending. Under the circumstances of this case, the defendant had to be brought to trial within thirty days, which is the eve of trial. See Practice Book § 43-41. In his reply brief, the defendant contends that jury selection in his case did not start for six weeks after the first motion to dismiss Moscowitz was heard. The thirty day period,

---

[28] The filing of the speedy trial motion alone undercuts the defendant's claim that Moscowitz was unresponsive to the defendant's wishes.

however, was tolled during the competency evaluation.[29]

Granted, there appears to have been a clash of personalities between the defendant and Moscowitz, but Moscowitz represented to the court that he could continue to represent the defendant. Although the defendant claimed that Moscowitz had not given him discovery materials, Moscowitz represented that he had given the discovery materials to the defendant, but perhaps not as quickly as the defendant would have liked because they had to be photocopied.

The defendant claims that there was a conflict of interest between him and Moscowitz, but he has not demonstrated what that conflict was other than to disagree on trial strategy. There were days that the defendant sat quietly in the courtroom and permitted his counsel to represent him. Moscowitz brought to Judge Devlin's attention facts that he had consulted with the defendant during cross-examination and requested continuances to discuss trial strategy. Having presided at trial, the court was able to assess the accuracy of that representation. As to presenting evidence of the defendant's character, Moscowitz called Dixon in order to obtain a ruling from the court as to the extent of cross-examination the state would be permitted. After the court ruled, the defendant and Moscowitz elected not to call Dixon.

If the defendant sustained any prejudice by not being present in the courtroom during critical stages of the proceedings, it was his choice to absent himself. When he told the court that he did not want to be present, Judge Devlin explained to him why it was in his interest to remain. The court even recessed proceedings for the remainder of the day so that the defendant could

---

[29] We can conclude only that Moscowitz' motion for a competency evaluation was made in the best interest of the defendant.

compose himself. No one other than the defendant was responsible for his behavior in front of the jury just prior to the court's charge. See *State* v. *Drakeford*, supra, 202 Conn. 79. The defendant was absent during the jury charge because he would not assure the court that he would conform his behavior to acceptable courtroom decorum. For all of the foregoing reasons, we conclude that neither Judge Damiani nor Judge Devlin abused their discretion in denying the defendant's motions and requests to dismiss Moscowitz.

The judgment is affirmed.

In this opinion HARPER, J., concurred.

ROGERS, J., concurring. I write separately because I believe that some of the actions of the prosecutor that the defendant, Jeffrey B. Williams, now contests crossed the line separating permissible conduct from impropriety. I nevertheless would conclude that those instances of misconduct did not result in the defendant's being deprived of a fair trial such that reversal of the judgment of conviction is required.

First, I believe that the prosecutor's question to the victim's sister as to what would happen when she got in trouble, to which the sister replied, "I got beatings," and the prosecutor's follow-up question, "By him?" i.e., the defendant, to which the sister answered in the affirmative, were violations of the court's earlier order disallowing the introduction of certain evidence of uncharged misconduct. "It is well settled that prosecutorial disobedience of a trial court order . . . constitutes improper conduct." *State* v. *Ortiz*, 280 Conn. 686, 911 A.2d 1055 (2006). A fair and realistic reading of the court's order, as illuminated by the arguments presented at the underlying hearing, is that it is broad enough to preclude evidence of *any* physical violence against the sister. The order by its plain language was

not limited to beatings with a paddle.[1] Moreover, the contemplated misconduct evidence was offered for purposes of showing *both* a common scheme and the defendant's intent to abuse the entire family; the latter rationale would apply to any type of beatings of the victim's sister, not just those administered with a paddle. Finally, the court excluded the evidence on the grounds that it was of limited relevance and was likely to cause undue prejudice. Clearly, evidence of beatings generally, as opposed to beatings with a paddle, would be even less relevant for the purpose of showing a common scheme, and at least equally prejudicial to the defendant. My concern is that the majority holding will encourage hypertechnical interpretations of future court orders that are contrary to their spirit, rather than common sense compliance shaped by attention to the reasoning underlying those orders.

I also would conclude that certain of the prosecutor's questions directed at Judith Moskal-Kanz, a nurse practitioner and forensic medical examiner who evaluated and treated the victim following her reports of abuse, were aimed at eliciting inappropriate testimony as to the victim's credibility and an ultimate issue in the case and, therefore, were improper. First, the prosecutor asked Moskal-Kanz whether she had an opinion, on the basis of everything that the victim told her and on her observations of the injury to the victim's hymen, "as to whether that injury was caused by sexual penetration of her by [the defendant's] penis." Moskal-Kanz replied that "the injury is most likely, especially coupled with that history, to be the result of the penile penetration that [the victim] described . . . ." Next, the prosecutor

---

[1] The court stated: "With respect to the allegations of beatings as to [the victim's sister], you know, that evidence may have some relevancy to a common scheme with respect to the family or an intent to abuse the family. There may be some relevance there, but as to that aspect of her testimony, I find that it is overly prejudicial, and so I'm going to exclude that evidence."

asked Moskal-Kanz whether she saw any inconsistencies in the details of the victim's report of abuse or any "exaggeration that cause[d] [Moskal-Kanz] to have any concern about whether [the victim's story] was true . . . ." Moskal-Kanz replied to both questions in the negative.

It is axiomatic that credibility determinations are the exclusive province of the jury. See *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005). Expert witnesses cannot invade that province "by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims." Id. Even indirect assertions as to credibility, which fall short of being literal statements of belief in a witness' truthfulness, are improper because they have the same substantive import as direct assertions and could be perceived by a jury as conclusive opinions. See *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001).

Similarly, an expert must not express an opinion on an ultimate issue of fact; *State* v. *Iban C.*, supra, 275 Conn., 634–35; such as whether sexual abuse has occurred. Although "expert testimony of reactions and behaviors common to victims of sexual abuse is admissible," it is impermissible "for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful." Id., 635. Thus, our Supreme Court has "found expert testimony stating that a victim's behavior was generally *consistent with* that of a victim of sexual or physical abuse to be admissible, and [has] distinguished such statements from expert testimony providing an opinion as to whether a particular victim had *in fact* suffered sexual abuse." (Emphasis in original.) Id.; see also *State* v. *Freeney*, 228 Conn. 582, 592, 637 A.2d 1088 (1994) ("[t]he distinction between testimony about the general behavior of victims and an opinion as to

whether the instant victim is telling the truth is critical"). Similarly, our Supreme Court has approved of expert testimony that "merely stated that [a] victim's injury was *consistent* with sexual abuse"; (emphasis in original) *State* v. *Iban C.*, supra, 638–39; but "did not contain a definitive diagnosis of child sexual abuse." Id., 638.

I believe that the recited portions of Moskal-Kanz' testimony ran afoul of these principles and, therefore, that the questioning to which the testimony was responsive was improper. The opinion Moskal-Kanz offered was more than a general assessment as to the consistency of the type of injury suffered by the victim with those typically found in sexual abuse victims; it was a conclusion as to the cause of the victim's injuries specifically, namely, that they resulted from the acts of the defendant that the victim had described. "[I]n cases in which an expert witness reaches a conclusion on the ultimate issue in part based upon statements made by the victim . . . the expert is necessarily making a determination about the victim's credibility." Id., 635–36. Additionally, Moskal-Kanz' testimony that the consistency and lack of exaggeration in the victim's account of abuse prevented Moskal-Kanz from having concerns about the truth of that account amounted to an indirect opinion that this particular victim was credible. See *State* v. *Thompson*, 266 Conn. 440, 455, 832 A.2d 626 (2003) (description of witness as " 'reliable and consistent' " was improper comment on witness' veracity).

Applying the factors set out in *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987),[2] I nevertheless would

---

[2] Those factors are: "the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

conclude that the foregoing instances of misconduct, taken together and viewed in the context of the entire proceedings, did not amount to a due process violation that deprived the defendant of a fair trial. Although the prosecutor's questions to the victim's sister apparently were spontaneous, those posed to Moskal-Kanz were, as noted by the majority, responsive to lines of inquiry previously pursued by defense counsel.[3] Viewed in the context of a lengthy trial and, in particular, the extensive testimony given by Moskal-Kanz, the objectionable questions posed by the prosecutor, although relating to the central issue of the case,[4] were isolated events and not particularly severe.[5] The failure of defense counsel

---

[3] Indeed, *prior* to the prosecutor's question that led Moskal-Kanz to give improper testimony as to the cause of the victim's injury, defense counsel repeatedly posed questions premised on the assumption that she *already* had given such testimony. In response, Moskal-Kanz indicated that she had not reached the presumed conclusion. The following colloquy between defense counsel and Moskal-Kanz, as well as that recounted in footnote 13 of the majority opinion, is illustrative:

"Q. Were you told by [the victim] that she was sexually abused?

"A. I was given specific details of sexual contact by [the victim], yes.

"Q. And you used that information; am I correct?

"A. Used it how?

"Q. To come to an opinion.

"A. Involving my opinion on?

"Q. The injury.

"A. No.

"Q. Just looking at the injury without even knowing that there had been sexual contact, without her telling you that, you came to the conclusion that that injury was caused by sexual contact?

"A. I didn't state I came to that conclusion.

*  *  *

"Q. Your opinion, you came to an opinion, and your opinion was based on the injury alone?

"A. I don't believe that anyone here has asked me if I've come to an opinion, so that's where I'm losing you on this."

[4] In contrast, the questions to the victim's sister were more collateral.

[5] I note that when claims such as the defendant's have been framed on appeal not as alleged instances of prosecutorial misconduct, but as trial courts having improperly admitted expert testimony pertaining to victims' credibility, they are deemed evidentiary and not constitutional in nature. See, e.g., *State* v. *Grenier*, supra, 257 Conn. 806–807; *State* v. *Carneiro*, 76

to object to any of the challenged questioning is notable in this regard. See *State* v. *Stevenson*, 269 Conn. 563, 576, 849 A.2d 626 (2004) ("counsel's failure to object at trial, while not itself *fatal* to a defendant's claim [of prosecutorial misconduct], frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error" [emphasis in original; internal quotation marks omitted]). Furthermore, the prosecutor did not refer back to the improperly solicited testimony in his closing argument, thereby emphasizing its importance.[6] Although no curative measures were taken to remedy the improper testimony, that circumstance is due to the defendant's failure to request any such measures, a further indication that counsel, at the time, did not view the misconduct as severe. Moreover, the victim testified at length at trial and was subject to the rigors of cross-examination such that the jury had ample opportunity to assess her credibility for itself. Finally, the case against the defendant was strong insofar as there was medical evidence of abuse, substantial constancy of accusation evidence as well as direct corroboration of some of the peripheral details of the victim's account of abuse, and a statement from the defendant to police that, while not a confession, contained strong indications of guilt in regard to

---

Conn. App. 425, 430, 820 A.2d 1053, cert. denied, 264 Conn. 909, 826 A.2d 180, cert. denied, 540 U.S. 915, 124 S. Ct. 304, 157 L. Ed. 2d 208 (2003).

[6] Rather, the prosecutor in closing argument implored the jurors to make their own assessment of the victim's credibility. He stated: "And to a large extent, it's the credibility of [the victim] that is the basis of this case . . . . You saw her testify, you heard her testify. Did she know what happened to her? Did she present it in a way that sounded reasonable, that sounded believable, that sounded as if she was recounting the mental picture of her ordeal to you as much as eight years after it happened? Did she know the details, did she provide a context for what had happened? Did the sequence of the abuse make sense in the way that the world lives? Those are the kinds of things that you use to determine credibility every single day. More important, was there anything in the case that you heard, in the evidence that's in this case that raises any reasonable doubt about the truthfulness of [the victim's] testimony?"

the sexual offenses charged.[7] I would affirm the judgment for the foregoing reasons.

---

[7] In his statement to police, the defendant, without having been informed of the nature of the allegations made by the victim against him, provided an account of the events in question that matched that of the victim as to time, location and, in part, type of sexual activity. He characterized that activity, however, as having been initiated by the child victim in the middle of the night as he slept. The jury apparently found the defendant's version of events implausible.